## 1159. BATES *v.* THE STATE.

1. A declaration of a witness previously made, inconsistent with his testimony in any material particular, is admissible for the purpose of impeachment, whether the declaration be a statement of facts inconsistent with his testimony, or an expression of opinion different from the conclusion which the facts testified to by him tend to establish.

2. As a general rule, a party may show any fact or circumstance that may affect the credit of an opposing witness. Therefore, on the trial of a criminal case, where a witness testifies against the defendant, the fact that the prosecutor is bail for the witness on an indictment is relevant testimony on the question of the credibility of the witness.

3. In charging the jury on the law of self-defense, it was error for the court to give instructions susceptible of the construction that words, threats, menaces, or contemptuous gestures could be considered only in determining whether the accused, in killing the deceased, acted under the fears of a reasonable man that his life was in danger; thus excluding the defense that he acted under a reasonable fear that a felony was about to be committed upon his person.

4. Where neither in the evidence nor in the defendant's statement was there any fact, circumstance, or inference indicating the offense of voluntary manslaughter, a charge on the law of voluntary manslaughter was erroneous; and the verdict finding the defendant guilty of that offense must be set aside.

Conviction of manslaughter, from Jasper superior court—Judge Lewis. April 20, 1908.

Argued June 9,—Decided July 8, 1908.

*Greene F. Johnson,* for plaintiff in error.

*Joseph E. Pottle, solicitor-general,* contra.

HILL, C. J. Sam Bates was indicted in the superior court of Jasper county for the crime of murder. He was convicted of voluntary manslaughter, and his motion for a new trial was overruled. The motion for a new trial contains numerous assignments of error, complaining of the admission of testimony, of the charge of the court, and of the failure to charge, and that the verdict for manslaughter is without evidence to support it. These assignments will be considered in their order so far as material, and will be fully understood by the following brief statement of the evidence: The State introduced the only witness who saw the homicide, and this witness testified, that the defendant, the deceased, and himself, on the day preceding the homicide, were out hunting birds; that during the afternoon they began drinking whisky, and about night they went into an old house called the

"Hardy place," for the purpose of playing cards for money. In a room of this house they built a fire, and they played there until about three o'clock in the morning, continuing to drink. About three o'clock the defendant got up from the game and said that he was going to quit, that he had to go home. Before he did this, the deceased, who was a loser in the game of cards, pawned his shotgun to the defendant for five dollars. When the defendant got up and said he was going home, the deceased told him to come on and go down to Mr. Hardy's, where he would get the five dollars and redeem his gun. The defendant started to get the gun, and the deceased "beat him to it" and got it, and told the defendant to come on down to Mr. Hardy's and get the five dollars. The defendant told him, no, he had to go home; and the deceased told the defendant two or three times to "come and go down there," to Mr. Hardy's, and the defendant replied each time that he had to go home. The defendant walked to the front door and turned around, and the deceased said something to him about the gun, and the defendant told the deceased to give it to him. The deceased told the defendant that he would not; that he was not going to do it, but to come on down and he would pay him for it. The defendant told the deceased to put the gun down, and that if he didn't, he would kill him; and about that time he shot, and the deceased fell. Adjoining the room where the shooting took place there was a little shed-room, and when it took place the witness ran into this shed-room, and the defendant went to the shed-room and shot at the witness. When the defendant started to shoot, the deceased said, "Don't do it;" and the witness said, "Don't do that, Sam." The deceased "was standing there, had his gun unbreeched, stooped over, looking up at [the defendant], laughing." Just before the defendant shot, the deceased said to him, "Come on and go down to Hardy's store and get the five dollars," that he owed him on the gun, that he had pawned it for. Just before the defendant fired, the deceased said "Don't do that." The defendant had his gun up on his shoulder, and had it on the deceased. He was four, five, or six feet from him. Just as the deceased said that, the defendant shot. All three were drinking liquor during the game, and, though not drunk, were under its influence. When the deceased got the gun he had pawned to the defendant, the defendant told him to give it to him, and told

him to put it down. The deceased had the gun in his hand when he told him to put it down. "I didn't have my knife out, and don't know why Sam shot at me. We had not had any fuss. I did not start at Sam with my knife. He run and throwed the gun in the door, and I jumped behind the door, and he shot right by me. He left the house soon after the shooting." This was all the testimony introduced by the State as to the criminal transaction.

The defendant introduced no evidence, but relied upon his statement. This statement corroborated the testimony of the one witness for the State as to the hunting, drinking, and playing cards, and gave the following account of the homicide: "I caught Rowe [the State's witness] dealing himself six cards, and I said I was going to quit. They said, 'Don't jump us that way. Come on back;' and I thought I would play a little more." "Ed, [the deceased] had pawned me his gun for $5. . . When I said I was going to quit, they said 'Don't jump us that way. Come on back.' . . I had Ed's gun, and I sat it down by the side of the fire board, and they wanted me to come over here [indicating], and I didn't think about any fuss. I was playing, and Rowe kept on drinking and fussing around more than any of us, like he always does. I said 'I am going home.' I said, 'Come on, Woody;' and Rowe jumped up and jerked out his knife, and said, 'God damn you, you shan't jump us this way;' and Ed said, 'I would rather die and be in hell than to be treated this way;' and I said, 'There is no use in your cutting up this way, I am going home;' and I picked up the single-barrel gun and started to get that other gun, and Ed beat me to it, and Rowe staggered up towards me and I began backing off; and by that time Ed had raised up with the gun, sorter sideways to me, and had his back to me, sorter fooling with it, and I heard it click, and I said, 'Ed, put that gun down;' and Rowe said 'Kill the damn jumping son of a bitch,' and Ed said 'Put down hell,' and Ed threw the gun down this way [indicating], and I shot, and Rowe jumped right across Ed's head, and I said, 'You pick up that God damn gun and I will kill you.' Then he run in there and he started back, and I throwed my gun up this way, and he dodged behind the door, and I shot through the door that led in there. Then I went and called the negro. He saw me when I shot Ed. I called him to come back in there.

Woody said, 'They will come back and kill you;' and I decided to take the gun he was laying on, and I caught him in the breast and laid him off the gun out of the blood, and I went on by Mr. Osburn's and called him up and told him that I had killed Waits, that I had to do it. I knew how Ed was any way when he got to drinking and got mad. He would hurt you. I went on then home. . . I was never in any trouble before this trouble, and I wouldn't have done this thing if it hadn't been for Ed trying to kill me."

We will decide specifically only those assignments of error which we think entitle the plaintiff in error to another trial.

1. The defendant in the court below offered to lay the foundation for the impeachment of the only witness to the homicide, introduced by the State. It was proposed to ask the witness the following questions: "Don't you recollect telling Henry Osburn, the next day after the homicide, that Sam [meaning the defendant] was coming clear?" The court excluded this question, on the ground that the testimony would be a mere matter of opinion, and therefore was not admissible to impeach the witness. We think this ruling was erroneous. This witness had testified to a state of facts which, if believed by the jury, would have authorized a conviction of murder. A statement made by him the very next day after the homicide, that the defendant "was coming clear," was entirely inconsistent with this opinion, if the facts testified to by him were true; and an expression of such an opinion by the witness was in effect a contradiction of his testimony. One of the most usual and impressive ways in which to contradict a statement is to prove a previous expression of an opinion inconsistent with such statement. The argument is both legitimate and logical that one who knows of the existence of facts which would establish a certain conclusion would not express an opinion contrary to and contradictory of these facts. To illustrate: if the witness in the present case, on the very day after the homicide, had stated that the defendant "would come clear," that opinion could not have been based upon the facts narrated in his testimony; for, according to these facts, the defendant was guilty of an unprovoked murder. If the witness had previously stated that the defendant was "coming clear," it was equivalent to an expression on his part of an opinion, from the facts within his knowledge, that the

defendant was not guilty. The expression of such an opinion would certainly tend to destroy the value of his testimony, which clearly showed that the defendant was guilty of murder.

We would be satisfied with the correctness of this conclusion even if it did not find support in any adjudicated case. But the Supreme Court has, we think, decided practically the same principle in several cases. In *Cox* v. *State,* 124 *Ga.* 95 (52 S. E. 150), it is held, that "Where a witness has testified to a material fact, prior declarations of his which appear to be inconsistent with the facts related by him on the trial are competent for the purpose of impeachment." In the instant case the witness testified to material facts that, if believed, proved the murder. The declaration attributed to him not only appeared to be inconsistent with these facts, but was in fact strongly and clearly inconsistent therewith. "The testimony of the witness was inculpatory. His previous declaration was exculpatory. The two were in direct antagonism." In *Central Railway Co.* v. *Trammell,* 114 *Ga.* 312 (40 S. E. 259), the court states the rule as follows: "In a case of the character disclosed by the present record, it is competent to prove, for the purpose of impeaching a witness who has testified that the fire was caused by other agencies than the railroad company, that on the night upon which the fire occurred he expressed a decided conviction that the fire was caused by the railroad company." In the opinion the court says: "Of course, proof of the previous statement did not necessarily show that his statement at the trial was false; but we think the jury should have been allowed to consider the evidence that he had, on a former occasion, expressed a very decided conviction, whether it was founded on sufficient reasons or not, that the fire was caused by sparks from the defendant's engine." In *Jordan* v. *State,* 120 *Ga.* 864 (48 S. E. 352), the court uses this language, "Where, in the trial of one accused of seduction, a witness for the accused has given testimony tending to show lewd conduct on the part of the prosecutrix, which, if true, was known to the witness prior to the time of the alleged seduction, declarations to third persons, made by him subsequently to that time, not in the presence of the accused, tending to show that he thought the prosecutrix a chaste and virtuous female, are admissible in evidence, after proper foundation laid, to impeach the witness." Proof of previous statements of witnesses,

inconsistent with their testimony, is not confined to previous statements of facts; proof of previous expressions of opinion which are inconsistent with the testimony of the witness, and which expressions of opinion tend to detract from the value of the testimony, should be allowed for the purpose of discrediting the witness. 1 Greenleaf on Evidence (16th ed.), §264 a. We conclude that the defendant in this case had the right to lay the foundation proposed, for the purpose of attacking the credibility of the witness, who was the only witness to the criminal act, and whose testimony bore so strongly against his innocence; and it was reversible error on the part of the trial judge to deny him this privilege.

2. Error is assigned upon the ruling of the court in refusing to allow the State's witness, on cross-examination, to answer the following question: "Is it not true that Cal Price is on your bond in this gambling case?" Cal Price was admittedly the real prosecutor; and, at the time the homicide occurred, this witness, with the deceased and the defendant, was gambling, and he had been indicted for gambling; and it is stated that he would have answered the question in the affirmative. The testimony was excluded on the ground that it was irrelevant. The court did permit, on cross-examination, evidence that this witness and the real prosecutor, Cal Price, were on intimate and friendly relations, and had been together during the trial. We think this testimony was admissible, as against the objection made to its introduction. The Penal Code, §1023, declares that "the state of the witness's feelings to the parties, and his relationship, may always be proved for the consideration of the jury." The relationship of the witness to one of the parties is an important fact in properly estimating the credit to be given the witness who swears in behalf of that party. The relationship of principal and bail is one that necessarily raises a sense of obligation on the part of the principal. The fact that the witness is an employee of one of the parties is a proper matter to be considered by the jury, in passing upon his credibility. *Central · Ry. Co.* v. *Bagley,* 121 *Ga.* 781 (49 S. E. 780). It has been frequently held that a party may prove anything which might in the slightest degree affect the credit of an opposing witness. Thus, it may be shown that the witness is under obligation to the party calling him. 8 Enc. Pl. & Pr. 120. A feeling of grateful obliga-

tion naturally arises in the breast of the principal towards his bail. This act of kindness on the part of the bail keeps him out of jail. In addition to this feeling there must also be a consciousness on the part of the principal that if he displeases in any way his bail, the latter can at once end his freedom and surrender him 'to the sheriff. Penal Code, §935. This testimony, therefore, we think, was clearly admissible as against the objection that it was irrelevant. This was the only objection urged against it in the court below.

3. The following excerpt from the charge of the court is assigned as error: "While it is true that a provocation by words, threats, menaces, or contemptuous gestures will not reduce the crime from murder to voluntary manslaughter, and that the crime would be murder, under the law, where it is done in the heat of passion growing out of a provocation by words, threats, menaces, or contemptuous gestures, yet it is proper, and the duty of the jury, in passing upon the question as to whether or not the defendant took the life of the deceased laboring under the fears of a reasonable man that his life was in danger, to take into consideration words, threats, menaces, or contemptuous gestures, together with all the other facts surrounding the homicide, in passing upon the issue as to whether or not he acted in self-defense, or under the fears of a reasonable man that his life was in danger." The objection which we think is justly made to this part of the charge is that, under it, words, threats, menaces, or contemptuous gestures can be considered by the jury only in determining whether the defendant acted under the fears of a reasonable man that his *life* was in danger. Under the law the right of self-defense exists as against one who manifestly intends or endeavors, by violence or surprise, either to take life or to commit a felony on the person, and the jury would have the right to consider words, threats, menaces, or contemptuous gestures, in deciding whether the defendant was acting under the fears of a reasonable man either that the purpose of the deceased was manifestly to commit a felony upon his person, or to take his life; in other words, that the right of self-defense exists in either event, and that the jury would have the same right 'in either case to consider words, threats, menaces, or contemptuous gestures, in determining the question as to whether or not the defendant was really acting under the fears

of a reasonable man that either crime was about to be committed by the deceased upon his person. *Cumming* v. *State,* 99 *Ga.* 662 (27 S. E. 177) ; *Stubbs* v. *State,* 110 *Ga.* 917 (36 S. E. 200).

4. The court charged the doctrine of voluntary manslaughter, and it is insisted that neither the evidence 'nor the defendant's statement authorized such charge. We have examined the evidence and the defendant's statement, and we have arrived at the conclusion, that on no view of the evidence or the statement, or any reasonable inference therefrom, could the offense of voluntary manslaughter be predicated; and that therefore the charge of the court on this subject was inapplicable and probably prejudicial to the defendant. The evidence for the State makes a case of unprovoked murder. According to this evidence, when the deceased was shot he had his gun unbreeched, and was looking up in the face of the defendant, laughing and begging him not to shoot him, and the only witness present also begged the defendant not to shoot the deceased. With no assault made upon him, with no provocation whatever to shoot, with nothing to justify any sudden heat of passion, the defendant shot the deceased. This is the evidence for the State.

The defendant introduced no testimony, but relied upon his own statement. In this statement he declared, that the deceased raised the gun towards him and he heard it click, and he called to the deceased to put the gun down, and that the deceased replied, "Put down hell;" that the third party present, the only witness for the State, called upon the deceased to "kill the damn jumping son of a bitch" (meaning the defendant) ; and that the deceased thereupon drew the gun upon him, and shot, to save his own life. It will thus be seen, from this brief statement, that there was no middle ground; that if the evidence for the State was the truth, the verdict should have been for murder; that if the defendant's statement was the truth, the defendant should have been acquitted; and that the charge on the law of voluntary manslaughter led the jury away from the consideration of the truth as it existed in the evidence, or from the truth as it existed in the prisoner's statement, and induced them to agree on a compromise verdict, without any evidence whatever to support it. Therefore, following the repeated rulings of the Supreme Court and of this court, we are constrained to hold in this case that the law of voluntary manslaugh-

ter was improperly given in charge by the court, and that the verdict of the jury for this offense, being without evidence, must be set aside as contrary to law. *Reeves* v. *State*, 2 *Ga. App.* 414 (58 .S. E. 548); *Watts* v. *State*, 3 *Ga. App.* 606 (60 S. E. 287); *Berry* v. *State*, 122 *Ga.* 429 (50 S. E. 345).

*Judgment reversed.*