## WASHINGTON *v.* THE STATE.

1. It is not necessary for the State to show affirmatively that a person who had been shot said he was in a dying condition, in order to admit proof of his declarations, if in point of fact he was in articulo mortis, and the circumstances were such that he must have known that he was in a dying condition, so that the jury might be instructed by the court as to whether the statements made by the deceased were spoken knowing of the immediate prospect of death.

(*b*) It is not error for the court to allow a witness to testify that the deceased, under the circumstances detailed in the foregoing headnote said that "he [meaning the defendant] shot me for nothing," over objection that this was a mere expression of opinion by the deceased, and not a declaration of the fact.

2. Where a defendant is on trial charged with murder, and the court refuses to charge the jury on involuntary manslaughter in the commission of a lawful act without due caution and circumspection, such refusal is not error where the evidence shows that the charge requested is not applicable.

3. Where, on the trial of a defendant charged with the crime of murder, the defense relied on is that the homicide was the result of accident or misfortune, and the court has correctly charged the jury the law in relation thereto, it is not error for the court to omit to *define* what would constitute accident or misfortune, in the absence of a request so to do.

4. It is not error for the court to charge the jury, on the trial of a defendant charged with murder and relying on the defense of accident or misfortune, that "while he [defendant] admits that he did the shooting as alleged by the State on or about the time alleged by the State," where the court follows that language immediately with the words "he [defendant] contends that the shooting was without malice aforethought, either express or implied, and contends that it was not his intention to kill, but was entirely an accident or misfortune, and that he would not be guilty of any offense under the law and evidence in this case."

5. Where the State relies mainly upon the dying declarations of the deceased to the effect that the defendant "shot him for nothing," it is reversible error for the court to refuse to allow a witness for the defendant to testify, that, shortly after deceased was shot by the defendant, the deceased told the witness that he and the defendant had had no difficulty, and that the shooting was an accident, the defense relied on ·by defendant being that the ·shooting was accidental, and the testimony being admissible for the purpose of impeaching the dying declarations of the deceased.

DECEMBER 14, 1911.

Indictment for murder. Before Judge J. B. Park. Jasper superior court. October 16, 1911.

*Eugene M. Baynes,* for plaintiff in error.

*T. S. Felder, attorney-general, J. E. Pottle, solicitor-general,* and *A. Y. Clement,* contra.

HILL, J. Richard Washington was indicted in Jasper superior court for the offense of murder, and at the August term, 1911,·of said court he was found guilty by the jury trying him, with the recommendation that his punishment be life imprisonment in the penitentiary. A motion for a new trial was made on the general grounds, which was afterwards amended. The motion, as amended, was overruled by the court, and the defendant assigns this ruling as error. The case made by the State is substantially as follows: On the night of the homicide defendant and deceased were at the house of William Smith; "there was no frolick there that night." Neither deceased nor defendant had had any previous difficulty, so far as the evidence discloses, just before the shooting, but were sitting down, laughing and talking. Just before the pistol fired the deceased asked the defendant for a cigarette, and the defendant asked the deceased if he wanted it "rolled hard or soft;" and shot him. The witness who testified to these facts was standing behind the defendant, in another room, and did not see defendant when he fired, and did not know where he got the pistol. But one shot was fired. The defendant did not say anything after he shot the deceased, but "stood out there in the floor with his head hung down, and then went out of the door with his head hung down." The deceased just said, "Oh, Lordy!" This witness and the deceased were sweethearts, and were to be married at Christmas; she was also a niece of the defendant, and had never heard of any trouble between the defendant and the deceased, but defendant always told her "he thought a lot of Sidney Roberts," the deceased. Two other

witnesses, Margaret and Nellie Folds, also testified to substantially the above facts, except that one of them, Nellie Folds, said that defendant got his pistol out of his front pocket. "Didn't see defendant bring anything else out with his pistol. After defendant asked deceased if he wanted it rolled hard and tight, he shot immediately. . . Richard [the defendant] did not point any pistol at him to make me expect that he was going to shoot. I did not hear Richard make any remark afterwards nor anybody else." Mr. Will Reid testified: "The night Sidney Roberts was killed Richard Washington came over to my house, which was four or five hundred yards from William Smith's house. Richard called me and woke me up, and told me he had shot Sidney Roberts. He walked up on the porch and called me, and said he had shot Sidney; and I asked him what he shot him for, and he said he didn't know; and I told him to go home, and he said he was scared to go home. Richard [defendant] did not say what he shot him for, and said he didn't know. Richard stayed in the cottonseed hulls on my place that night, and I woke him up next morning. I went to see Sid, and when I came back Richard was standing on the doorsteps. I said I didn't believe Sid would live until dinner; and Richard told his wife to get his clothes, he was going to leave. I told him not to do that. I gave him his pistol. Richard did not say what he intended to do." Mr. W. F. Persons testified that he made an effort to arrest the defendant after the homicide was committed. "I arrested him three weeks ago in Florida. I had been searching for him and trying to find him before that." Dr. J. H. Bullard testified that he was called to attend Sid Roberts, the deceased. Did not probe for the ball; "the man's condition did not justify it. The wound on his body was from a pistol ball, I suppose." The wound was right in front of his body, and caused his death. If two men of about the same size were facing each other and one fired a pistol at the other, the ball would enter about as this one did. "When I got there the man was suffering greatly, and was sinking rapidly, not in a comatose state, but showing extreme weakness and pain; and I stated to him I couldn't do him any good—could probably give him a little relief; and he was speaking about the occurrence, and said the man shot him for nothing, that he had not done a thing to him; and he gradually grew weaker and weaker. I remained around there for some time, and he went into a state of coma."

The theory of the defense was that the homicide was accidental. In his statement to the jury, the defendant said, that he and the deceased had been joking around the fireplace and playing, and when the deceased asked him for a cigarette, he asked deceased if he wanted it rolled hard; that the deceased replied yes, and defendant said he would roll it for him; that he intended to get the tobacco out of his pocket, and when he pulled the pistol out he didn't know there was a cartridge in it; that the pistol must have been ready cocked in his pocket. He didn't remember putting any finger on the trigger, " and after the thing fired, it hurt me so bad; it almost burst my heart." He stood there a few minutes, and went over to Mr. Reid's and told Mr. Reid about it, and asked if he could stay there that night. "I knew I done this thing accidental and couldn't help it, and didn't want to meet none of his folks." The accused further stated, that he did not get his pistol out of his front pocket, but out of his hind pocket; that his pistol, tobacco, and a rule were all in his overalls pants pockets; that he had no idea in the world that the pistol was going to shoot; that he had never had a cross word with deceased or any of his folks; that the reason he left was that the next morning he went to Mr. Mobley and told him about it, and the latter said, "Stay out of the way three or four days, to keep Lucius Roberts from hurting you," and until Mr. Mobley got well, and he would settle it; that he went off as Mr. Mobley told him to do, and when he heard Mr. Mobley was still sick, he "went on;" that he told Mr. Henderson that morning in the room that he didn't feel like going off, because he did not do the thing intentionally; that he didn't try to hide, but wrote back home twice every week, and he left home because Mr. Mobley said he would settle it and keep defendant from "having trouble with the boy's folks, and Mr. Mobley hasn't got able to settle it yet."

1. The court permitted Dr. Bullard, the attending physician, to testify, over the objection of the defendant's counsel, that "When I got there the man was suffering greatly, and was sinking rapidly, not in a comatose state, but showing extreme weakness and pain; and I stated to him I couldn't do him any good—could probably give him a little relief; and he was speaking about the occurrence, and said the man shot him for nothing, that he had not done a thing to him; and he gradually grew weaker and weaker. I remained

around there for some time, and he went into a state of coma. I stayed some little time after I had this little conversation. I don't know that he died the next day or the day following; I don't know the hour he died." Movant objected to the foregoing testimony on the grounds, that it was irrelevant and immaterial: (*a*) that the circumstances of the case did not show that the declarations of the deceased were dying declarations, and in order for them to be admitted as such the deceased must be "in extremis;" (*b*) that the statement made by the deceased that "he shot me for nothing" was a mere expression of opinion by the deceased. We think the evidence was material and admissible. This court has' held that in order to render dying declarations admissible, it is not necessary for the State to show that the deceased affirmatively said he was in a dying condition, or used language of similar character. It is proper to allow the declarations to be proved, if the deceased was in fact in articulo mortis, and the circumstances were such as that he must have known this, that the jury may be instructed by the court as to whether the statements made by the deceased were conscious utterances in the apprehension and immediate prospect of death. *Young* v. *State,* 114 *Ga.* 849 (40 S. E. 1000) ; *Perdue* v. *State,* 135 *Ga.* 278 (8), 285 (69 S. E. 184) ; *Darby* v. *State,* 79 *Ga.* 63 (3 S. E. 663). Nor was it error, under the facts of this case, to allow the witnesses to testify that the deceased said that "he shot me for nothing," over objection that this was a mere expression of opinion by the deceased, and not a declaration of the fact. *White* v. *State,* 100 *Ga.* 659 (2), 664 (28 S. E. 423) ; *Darby* v. *State,* supra.

2-4. Under the facts of this case, it was not error for the court to refuse to charge the jury the law of involuntary manslaughter in the commission of a lawful act without due caution and circumspection. If the defendant desired a fuller charge on the subject of a homicide alleged to have been committed by misfortune or accident, such a request should have been made to the court. The court did charge the jury, " As I said to you just now, the defendant contends that he is not guilty of any offense. While he admits he did the shooting, he contends that the shooting was an accident or misfortune, without any malice either express or implied, and without any intention to kill whatever, and that under the law and facts in this case would not be guilty of any offense what-

ever. The law says a person shall not be found guilty of any crime or misdemeanor committed by misfortune or accident, and where it satisfactorily appears that there was no evil design or intention, or culpable neglect." We think this clearly states the rule, and that there is no merit in the contention that the court omitted to *define* what would constitute accident or misfortune. We do not see how the jury could have misunderstood the language; but if the defendant wanted the charge to be more full and explicit, a request to that effect should have been made. And this ruling applies to the other ground of the motion, that "the charge of the court is correct as far as it goes." If the charge is not full enough, a request should be made to amplify it.

We do not think there is any merit in the 10th ground of the motion, and that the construction placed upon the language in the charge is not fairly inferable from the language itself, when fairly understood. The court charged the jury, that "the defendant, on the other hand, contends that he is not guilty of any offense. While he admits that he did the shooting as alleged by the State on or about the time alleged by the State, he contends that the shooting was without malice aforethought, either express or implied, and contends that it was not his intention to kill, but was entirely an accident or misfortune, and that he would not be guilty of any offense under the law and evidence in this case." We do not think that this charge is susceptible of the construction contended for by the plaintiff in error, to the effect that the charge misstated the contention of the defendant, because "defendant did not contend or admit that he did the shooting *as alleged* in the indictment, for if such admission had been made he would be guilty of murder." Taken in connection with the context, it is clear that the court did not so intend, nor could the jury have reasonably so understood.

5. It is also insisted by the plaintiff in error that the court erred in refusing to allow the witness, John Henderson, to answer the following: "You and several other white men went down to see Sidney Roberts right after he was shot, and didn't Sidney at that time tell you that he had had no trouble with Richard Washington, and the thing was an accident?" The plaintiff in error contends that the witness, if permitted, would have answered "yes" to this question, and that the presiding judge was then and there informed what would be the answer of the witness. We think

the court erred in excluding this question and answer from the jury. It was not admissible as a dying declaration, or as a part of the res gestæ; but where the State relied largely upon the dying declarations of the deceased to convict the accused, it is admissible to show that after the deceased was shot he made statements in conflict with such dying declarations. *Battle* v. *State,* 74 *Ga.* 101. In other words, it was admissible for the purpose of impeachment. In addition to other methods, a witness may be impeached by proof of contradictory statements. And this court has held that dying declarations may be impeached by proving contradictory statements made by the deceased. In the case of *Battle* v. *State,* supra, this court said: "It can not be easily seen, if the dying declarations of the deceased, made ex parte in the presence of his own friends and relatives, and not in the presence of the accused or his friends, without a cross-examination, and testified to by his friends and relatives, are to be admitted against the accused from the necessity of the case, why the declarations of the deceased after the mortal blow is given, to other persons and at other times, different from the dying declarations, should not be admitted in evidence to impeach the dying statement. If the one is admitted contrary to the general rule, why should not the other likewise be admitted? The former is admitted in favor of public justice; why not the latter in favor of life and liberty?" See, also, *Bales* v. *State,* 4 *Ga. App.* 486 (61 S. E. 888); *Columbus R. Co.* v. *Peddy,* 120 *Ga.* 589 (48 S. E. 149); *Jordan* v. *State,* 120 *Ga.* 864 (48 S. E. 352); *Cox* v. *State,* 124 *Ga.* 95 (52 S. E. 150). The dying declaration of the deceased, relied on for conviction by the State, was that the defendant had "shot him for nothing." In reply to this, the defendant sought to show by the testimony excluded that soon after the deceased was shot he said that he had had no trouble with the defendant, and "the thing was an accident." This statement is at variance with the dying declaration and utterly inconsistent with it; and the defendant was entitled to show, if he could, that soon after the shot was fired the deceased said that the shooting was accidental, as being in conflict with his dying declarations. As the defendant was entitled to this testimony, for the purpose stated, and the same having been excluded from the jury, we think that the court erred in so doing, and that the judgment of the court below overruling the motion for a new trial should be reversed.

*Judgment reversed.    All the Justices concur.*