## WALL v. THE STATE. LEWIS v. THE STATE.

1. Evidence tending to show motive is always relevant and admissible; and where there is evidence from which the inference might be drawn that the defendants had conspired to avenge one of their number who had been shot by the town marshal in a previous difficulty, evidence of such difficulty was properly admitted by the court.
2. Unless a conspiracy is shown prima facie, evidence of the acts and declarations of one of the alleged conspirators can only operate against the person whose acts and declarations are proved, if he is on trial; or if he is not on trial, they are not admissible against the defendants on trial, and should be rejected.
(a) Acts and declarations of a codefendant or alleged conspirator are admissible against the other only when made and done during the pendency of the criminal enterprise and in furtherance of its object.
(b) The declarations or conduct of one joint conspirator, made after the enterprise is ended, are inadmissible except against the person making them, and against others must be rejected as narrative merely of past occurrences.
3. When testimony is improperly admitted at the stage of the trial when it goes to the jury, subsequent proof, which renders its admission proper, cures any error in its prior admission.
4. A party may show any fact or circumstance that may affect the credit of an opposing witness; and the court erred in refusing to permit the defendant to show by the sheriff, who was a witness for the State, on his cross-examination, that he had refused to permit counsel for the defendant to have a conference with his client out of the presence of the other inmates in the same cell, on the alleged ground that it was unfair to the prosecution; this evidence tending to show bias of this witness against the accused.

5. Proof of acts of an alleged conspirator, after its termination, are not admissible against another alleged conspirator; and the court erred in admitting, over the defendant's objection, proof that one of said alleged conspirators after the criminal enterprise was over, brought to the home of the witness a pistol; and in admitting such weapon in evidence.

6 (7). The trial judge did not commit error in instructing the jury that "the words, reasonable doubt . . mean what they necessarily imply. They do not mean an entire absence of doubt, no doubt at all, an entire want of doubt; nor do they mean a whimsical, capricious, or fictitious doubt, but, as the words imply, a reasonable doubt."

7 (8). An instruction that "it is only when a felony is intended that a killing is justifiable," that "if the assailant intends to commit a trespass only, to kill is manslaughter," and that "if he intends a felony, the killing is self-defense and is justifiable," is a correct instruction applicable to self-defense, and under the facts stated in this ground we cannot say it was error; but it would be improper to give this instruction immediately after reading section 70 of the Penal Code, if the court did not make it clear to the jury that such instruction did not apply to the defense that the homicide was committed in defense of habitation, as set out in said section.

8 (9). The court did not err in its instructions to the jury upon the subject of conspiracy, under the facts of this case.

9 (10). The court erred in refusing, when properly requested so to do by the defendant, to charge the jury that no officer has any authority, without a warrant, to arrest a person charged with a crime, unless such offense was committed in his presence, or the offender is endeavoring to escape, or for other cause there is likely to be a failure of justice for want of an officer to issue a warrant; especially when the court nowhere referred in his charge to the defense set up that the defendants who killed the deceased were justified in so doing in resisting an illegal arrest.

10 (11). The court did not err in refusing to charge, when properly requested by the defendant, that the sheriff and his posse were without legal authority to attempt to enter the habitation of Fate Chapman in the manner in which they did; the same being too general and indefinite, and not stating any legal proposition.

11 (12). A person can use necessary force in resisting an illegal arrest, which must be proportionate to that used by the arresting officer; but no person can justifiably kill another merely because such person is undertaking to illegally arrest the slayer. If, however, a person kill another to avoid an illegal arrest, and not in a spirit of revenge, the homicide is generally manslaughter, and not murder. If in the progress of the arrest the officer manifestly intends or endeavors by violence or surprise to take the life of, or commit a felony on, the person sought to be arrested, the latter would be fully justified in killing the officer or other person thus attempting his illegal arrest. If the circumstances surrounding the person at the time his illegal arrest is attempted are such as to excite the fears of a reasonable man that his life is in danger, or that a felony is about to be committed upon his person, and if, under

the influence of such fears and not in a spirit of revenge, he slays the officer or other person attempting to illegally arrest him, he would be fully justified. If he were put in fear of a lesser injury than that of a felony, the homicide would be manslaughter.

12 (13). A new trial being granted in this case, we do not pass upon the sufficiency of the evidence to authorize a conviction.

Nos. 3004, 3005. April 17, 1922.

Indictment for murder. Before Judge Gower. Dooly superior court. November 17, 1921.

Buddie Wall and nineteen other negroes were jointly indicted for the murder of Robert Davis, a white man, in Dooly county, on May 17, 1921. The evidence was as follows: On May 17, 1921, W. D. Cunningham, the marshal of Byromville, went to the home of Fate Chapman, a negro, to collect a tax fi. fa. for $1.75, in favor of that town, or, in default of its payment, to levy the same. Chapman said the fi. fa. wasn't just, and refused to pay it. The marshal then told him he would levy the fi. fa. on one of his mules in his lot. Chapman said he should not go into his lot for that purpose. They got into a tussle, when Chapman's wife came out, and said she would pay the tax. The marshal said that was all right, but that he would have to take Chapman to town because he had resisted the marshal in the execution of this process. Chapman told the marshal that the latter could not take him to town. The marshal said he would. The marshal then seized Chapman, and the latter grabbed the marshal, who was pushed back into the yard. Chapman got the marshal's pistol, but the marshal recovered it. In the struggle which ensued, the marshal shot Chapman in the leg. Chapman went into his home and told the marshal to wait until he came out. The marshal got behind a tree, waited a second or so for Chapman to come out, and, when Chapman did not come out, returned to town. Later in the day the marshal went back to Chapman's to arrest him on the charge of resisting an officer. When he got there a doctor, attending Chapman, informed the marshal that Chapman was not able to go or be taken to town. Thereupon the marshal told Chapman that he would come back in the afternoon or next morning, and that Chapman could give a fifty-dollar bond for his appearance to answer the said charge. Chapman said that would be all right, " We will arrange it all right, Mr. Cunningham."

Ben Byrom testified that on the afternoon of May 17, 1921, he

saw Lawyer West, who told him that the police had shot Fate Chapman about taxes. The witness told West that Chapman ought to have paid his taxes. West said, "There ought to be something done about it." On the afternoon of May 17, 1921, Sam Byrom was passing the home of Ras Cobb, when the latter said to the former, "I expect that I will need you to-night about dark; if I do, I will let you know, and if you come I want you to bring your gun." That morning, after Chapman was shot, Sam Byrom, Lee Adams, Chess Lewis, Jim Bennefield, and Rich Davis, with others, were at Fate Chapman's house. On the same day Lee Adams was at the home of Ras Cobb, and told him that he wanted him (Ras Cobb) to come down there that night and be with them at Fate Chapman's; that he thought there was a crowd coming in on him there. Buddie Wall, Zolly West, and Jim Bennefield were at the store of Ras Cobb that afternoon about three or four o'clock. Chess Lewis was at Fate Chapman's at the time he had the trouble with the marshal. He told Fate if he was him he would get a gun and shoot the son of a bitch, referring to the marshal. On the same day Luke West bought from R. W. Espy, a hardware merchant at Montezuma, a box of twenty-five buckshot shell. On the night of that day, between seven and eight o'clock, Rich Davis and Jim Bennefield went to Fate Chapman's house. Bennefield carried a single-barrel shotgun with him. When they got there Lee Adams was there. Rich Davis and Jim Bennefield soon left, and went and took a seat on a bench in front of Lee Adams' house. Bennefield had his gun with him. There they met Ras Cobb, who had his gun. After awhile Lee Adams came down there with his gun. Causey Chapman came from around towards Fate's, with a double-barrel gun. After a little Buddie Wall came there. He had a big black pistol. Finally came Chess Lewis, who had a little bright-looking pistol, and J. T. Davis had a double-barrel shotgun. After they all got together Ras Cobb said, "Let's go back behind the hall somewhere and shoot, so the white folks will come;" and Lee Adams said, "Well. I can do as much shooting as anybody." They then went on down there, and shot off their guns. How many shots were fired is uncertain. There was volley after volley. One witness says they shot twelve or fifteen times. One witness says there were 100 or 150 shots fired.

Hearing these shots in the direction of the negro churches, which stand near the home of Fate Chapman, in the city limits, the marshal went down to investigate. He got as far as the house of the section foreman, who told him that he shot after the other shooting had happened, right at his home, to bluff them off and not let them come and shoot into his home. The marshal did not go as far as Chapman's home. After getting as far as Sarah Prince's house, and seeing or hearing nothing, he returned to the depot in town. Some boys had been down to Chapman's home and reported that his yard was full of negroes with guns, who cursed them. In about thirty minutes the sheriff reached the depot where a crowd of about twenty-five men had collected. He had been called to Byromville, and told they had been having some trouble. The sheriff said, " Let's go to Fate's home and arrest those who have done the shooting." The sheriff and a posse of about sixteen went to Fate Chapman's home. When they got there they surrounded this house. The sheriff stopped in front of the house. Some went to the rear. Some went around to the left. Cleveland Thorpe and the deceased went into the yard. According to the testimony of the marshal, up to that time not a word was said to these negroes; the sheriff had not said anything to them, and had not commanded them to surrender.

W. C. Kitchens, the justice of the peace, testified, that when they first got to the house of Fate Chapman, the sheriff told them to lay down their guns, come out from under and in the house, hold up their hands, come to him, and there should not be a man hurt. The sheriff testified he told those negroes to come out from in there, and they would not be hurt; and that he was the sheriff of Dooly county. T. T. Thombley, a witness for the State, testified, that he did not remember that anything was said to the occupants of the home, before they separated and surrounded the home. If the sheriff had made that statement in his presence, before they separated, loud enough to be heard a hundred and fifty yards, he sure would have heard it.

The sheriff and his posse, including the deceased, went to Fate Chapman's house to arrest these negroes for that shooting. The State admitted that they had no warrant for their arrest. Cleveland Thorpe arrested the defendant, brought him to the fence, turned him over to the marshal, who handcuffed him, carried him

to Mr. Middleton, and told the latter to take him up town and lock him up. When Chess Lewis came out of the yard T. T. Thombley, one of the sheriff's posse, halted him, told him to hold up his hands and come there. He didn't come until they holloed to him the second time, and told him if he didn't put up his hands and come they would shoot him. He then threw up his hands and came walking to them. When searched, a little thirty-two pistol was found upon him. They chained Chess Lewis to a part of an old wagon-wheel. Up to that time no shots had been fired by the negroes or by the sheriff and his posse. Shortly after the arrest of the defendant a pistol shot was fired from under the front of the house, and flashed around towards the northwest corner of the house. This pistol was fired from three to five times before any other gun fired. Then a shotgun fired several times. The first shot fired from the shotgun went to the northwest of the house in the direction of the deceased. The latter did not fall at the first crack of the shotgun, but fell at the second shot from the shotgun. From this wound the deceased died. Up to the time of the second shot from the shotgun the deceased had not fired a shot, but was in the yard with a shotgun in his hand. No member of the sheriff's posse had fired a shot before the shot was fired from under the house. When the shots came from under the house the members of the posse began to shoot generally. Chess Lewis and Buddie Wall were in the yard before the shooting started. Lawyer West came out of the back yard, and was shot. When asked how he came there, he said his father, Luke West, sent him there. When asked " Whose gun is that ? " he said it belonged to Luke, that Luke gave him the gun and shells, and told him to come there and protect Fate Chapman.

Jim Bennefield was shot down in the lot that night by the justice of the peace, who testified that Bennefield had been shooting at him with a pistol. Who fired the first pistol shots and the first gun shots from under the house is not disclosed by the evidence. Lawyer West came out of the yard. It looked as if he raised up right out from under the corner of the house, and raised shooting. A big army pistol was found under the edge of the house. Lawyer West had a big long shotgun when he fell, which was taken from him that night. One came from the kitchen of Fate Chapman's house, and one from between the mattresses of his bed. Am-

munition from the house, from the rifles and from the pockets of the negroes was exhibited.

After the affair Chess Lewis gave the sheriff the names of all the parties who were there, told the sheriff that he went down to Lilly after Willie Chapman, that Causey sent him down there to tell Willie to come up there and bring his gun. He said that J. T. Davis went with him to get Willie Chapman. When Chess was arrested he was brought to the sheriff, and while there punched the sheriff a time or two. The sheriff asked him what he wanted, and he said the home back there was full of negroes. The sheriff asked him who lived there, and he said Lee Adams. The sheriff asked him where Lee was, and he said he was over there under Fate Chapman's house.

The sheriff shot and killed Willie Chapman the next morning. Some one informed the sheriff that there was a fellow shot through the head at Lilly. The sheriff drove down there to see about him, and found Willie Chapman about fifty yards from the corner of his house. When the sheriff drove up and got out of his car, Chapman ran around to get back in the house. The sheriff commanded him several times to stop, he didn't stop, and the sheriff shot and killed him. He was unarmed.

The jury convicted the defendant, and recommended him to life imprisonment. He was so sentenced. The defendant made a motion for new trial, which was overruled; and error is assigned on this judgment.

*Gilbert C. Robinson* and *W. V. Harvard,* for plaintiffs in error.

*George M. Napier, attorney-general, J. B. Wall, solicitor-general, Seward M. Smith, asst. atty.-general, Jesse Grantham, Watts Powell, Henderson & Davis,* and *E. J. Dykes,* contra.

HINES, J. (After stating the foregoing facts.)

1. In the fifth ground of the amendment to his motion for new trial the defendant Buddie Wall asserts that the court erred in permitting W. D. Cunningham to testify as to the difficulty which took place on the morning preceding the night of the homicide between him and Fate Chapman, arising out of his effort as marshal of Byromville to collect, or enforce the collection of, a tax fi. fa. of that town against Chapman. In this difficulty Cunningham, while endeavoring as marshal to collect or levy said fi. fa. on the property of Chapman, became involved in a tussle with

Chapman, and during the same, shot the latter in one of his legs. One of the theories of the State in this case is that the defendant and some or all of his codefendants had, at the time of the killing of the deceased, assembled themselves together at the home of Chapman, had shot off their pistols for the purpose of attracting and drawing the white people into ambush at Chapman's house for the purpose of killing them, and that at the time of his homicide these defendants were assembled at the Chapman house to carry out this purpose. There is some evidence from which the jury might draw an inference that this contention was true. We do not mean to say that this contention is true. In view of this contention of the State, the evidence touching what had occurred the previous morning between the marshal and Chapman was properly admitted for the purpose of showing the motive on the part of the defendants in arming themselves and meeting at the Chapman home that night. This evidence tended to show motive for the defendants to arm and meet at the Chapman house, and sheds light on the question whether they had formed a conspiracy to seek revenge for the injury inflicted by the marshal on Chapman. Evidence tending to show motive is always relevant and admissible. *Wall* v. *State,* 126 *Ga.* 86 (54 S. E. 815); *Boone* v. *State,* 145 *Ga.* 37 (88 S. E. 558).

2. We come next to consider the 6th, 8th, 9th, 10th, 11th, and 12th grounds of the amendment to defendant's motion for new trial. In the sixth ground of his amendment the defendant claims that the court erred in permitting Ben Byrom to testify that on the afternoon before the deceased was killed he saw Lawyer West and told him that the police had shot Fate Chapman; and when asked why the police had shot him, he replied, about taxes. West said there ought to be something done about it. In the eighth ground it is alleged that the court erred in permitting Sam Byrom to testify that on the afternoon of the day on the night of which the deceased was killed he was passing the home of Ras Cobb, who said to this witness, that he expected he would need the witness that night about dark, and if he did he would let the witness know, and if the witness came he wanted the witness to bring his gun. In the ninth ground it is alleged that the court erred in permitting Sam Byrom to testify that as he came out of the door of Fate Chapman's house Jim Bennefield said, " You go, and I will follow."

In the tenth ground it is alleged, that the court erred in permitting Sis Cobb to testify that she saw Lee Adams at her home on the day of the night before this homicide, that Adams was talking to her husband, Ras Cobb, that he told her husband that he wanted her husband to come down there that night and be with them at Chapman's, that he thought a crowd was coming in on them down there. In the eleventh ground it is complained that the court erred in permitting Martha Chapman to testify that she saw Chess Lewis at the home of Fate Chapman at the time of the difficulty between Chapman and the marshal, and that Lewis told Chapman if he were Chapman he would get a gun and shoot the son of a bitch, referring to the marshal. In the twelfth ground it is asserted that the court erred in permitting R. W. Espy to testify that he was in the hardware business at Montezuma, and that on the seventeenth day of May Luke West bought a box of 25 buckshot shells from him. The objection to the foregoing testimony was that the same was irrelevant, immaterial, and hearsay; and that such acts and declarations of other defendants, not in the presence of these defendants, and without their knowledge, was not admissible against them, in the absence of aliunde proof of conspiracy.

Unless a conspiracy is shown prima facie, evidence of the acts and declarations of one of the alleged conspirators can only operate against the person whose acts and declarations are proved, if he is on trial; or, if he is not on trial, they are not admissible against the defendants on trial, and should be rejected. Acts and declarations of a codefendant or alleged conspirator are admissible against the other only when made and done during the pendency of the criminal enterprise and in furtherance of its object. Penal Code, § 1025; *Foster* v. *Thrasher,* 45 *Ga.* 517, 519; *Horton* v. *State,* 66 *Ga.* 690; *Byrd* v. *State,* 68 *Ga.* 661; *Carter* v. *State,* 106 *Ga.* 372 (5), 376 (32 S. E. 345, 71 Am. St. R. 262); *Slaughter* v. *State,* 113 *Ga.* 284 (38 S. E. 854, 84 Am. St. R. 242); *Barrow* v. *State,* 121 *Ga.* 187 (48 S. E. 950); *Harrell* v. *State,* 121 *Ga.* 607 (49 S. E. 703); *Rawlins* v. *State,* 124 *Ga.* 31 (12), 46 (52 S. E. 1); *Coleman* v. *State,* 141 *Ga.* 731 (82 S. E. 228); *Smith* v. *State,* 148 *Ga.* 332 (96 S. E. C32); *Almand* v. *Thomas,* 148 *Ga.* 369 (96 S. E. 962).

The declarations or conduct of one joint conspirator, made after

the enterprise is ended, are inadmissible except against the person making them, and against others must be rejected as a narrative merely of past occurrences. *Gibbs* v. *State,* 144 *Ga.* 166 (86 S. E. 543) ; *Almand* v. *Thomas,* supra; *Hicks* v. *State,* 11 *Ga. App.* 265 (75 S. E. 12) ; *Baker* v. *State,* 17 *Ga. App.* 279 (86 S. E. 530).

This rule is subject to the qualification that each is responsible for the acts of the others only so far as such acts are naturally or necessarily done pursuant to or in furtherance of the conspiracy. *Handley* v. *State,* 115 *Ga.* 584 (41 S. E. 992).

The reason of this principle of law has been stated thus: "No man's connection with a conspiracy can be legally established by what the others did in his absence and without his knowledge and concurrence." U. S. *v.* Babcock, 3 Dill. (U. S.) 581, 24 Fed. Cas. 1913, No. 14487. The Supreme Court of California said: "To admit such declarations — such hearsay testimony — in proof of the conspiracy itself would in civil matters ' put every man at the mercy of rogues,' . . and, in charges of criminal conspiracy, render the innocent the helpless victims of villainous schemes, supported and proved by the prearranged and manufactured evidence of the promoters thereof." People *v.* Irwin, 77 Cal. 494 (20 Pac. 56). Again, it has been said: "A species or form of evidence which is in its nature inadmissible, unless some prior or other fact is proved, cannot be received to establish the fact, proof of which is an indispensable condition of its own admissibility." Cuyler *v.* McCartney, 40 N. Y. 221, 33 Barb. 265.

The criminal conspiracy can not be shown by declarations of alleged conspirators, not in the presence of, and without the knowledge of, others sought to be bound thereby; but must be established by aliunde proof sufficient to establish prima facie the fact of conspiracy between the parties. *Horton* v. *State,* 66 *Ga.* 690, 693; Cuyler *v.* McCartney, supra.

Applying the above principles of law to the grounds of the motion for new trial now under consideration, the court erred in admitting the evidence set out in the 6th, 8th, 9th, 10th, and 12th grounds of the motion for new trial. The court did not err in admitting the evidence set out in the 11th ground. The defendants were tried jointly. The objection to the admission of this testimony was that it was irrelevant, immaterial, and hearsay. Clearly this evidence was admissible against Chess Lewis; and the

defendant, Buddie Wall, should have objected specially to its admission as to himself and requested the court to instruct the jury that it was admitted solely to bind Chess Lewis, and not to bind Wall.

3. In the thirteenth ground it is complained that the court erred in permitting W. C. Kitchens to testify that on the night of the 17th of May he heard some shooting in the negro town across the railroad where Fate Chapman lived; that the negro lodge is down there next to Lee Adams' house; that they are all there pretty close together; that there was just one volley after another, three, four, or five, from several shotguns and pistols; that there were fifty or a hundred shots, he reckons; that one Josey came after him and told him that the sheriff was down town and wanted him to come down there. The defendant objected to the introduction of this evidence, unless it was shown that the defendant was connected with this shooting. The court overruled this objection, and admitted the testimony. While it had not been shown, at the time this testimony was delivered, that the defendant was connected with this shooting, this fact was afterwards proved by the State; and this cured any error in the prior admission of this evidence. *McDaniel* v. *State,* 103 *Ga.* 268 (3), 270 (30 S. E. 29) ; *Harrell* v. *State,* 121 *Ga.* 607 (3), 609 (49 S. E. 703).

4. In the fourteenth ground it is alleged that the court erred in refusing to permit Cossey Vinson, the sheriff of Dooly county, while on the stand, and during his cross-examination, to answer the following question propounded to him by counsel for the defendant: " While these men were in jail we endeavored, Mr. Harvard and myself [meaning G. C. Robinson, one of defendant's counsel] to get you to allow us to take one of these defendants out of the cell and have a conversation with him ? " The solicitor-general objected to this question, on the ground that it was irrelevant and immaterial. Counsel for the defendant stated to the court that they expected to show that they requested the sheriff to allow them to take one of the defendants out with a deputy to another cell in the jail, away from the other parties, for a conference; and that the sheriff stated that he could not do that, that it would not be fair to the prosecution in the case, when the day before, or probably two or three days before, the prosecuting attorney in the case went down to the jail, took several of these

men out of the cells, talked with them, and some days thereafter went down to the jail, took some of the prisoners out of the jail and off down to a house some distance from the jail and had a conversation with them. Counsel for the defendant further stated that they offered this testimony for the purpose of showing the interest of the sheriff in the case. The court sustained said objection and refused to permit the witness to answer the same. In this we think the court erred. We think that the defendant should have been allowed to prove any facts tending to show that the sheriff was a partisan of the State in this transaction. The state of a witness's feelings toward the parties and his relation may always be proved for the consideration of the jury. Penal Code, § 1049. It was not error for the court to permit the State to prove by a witness for the defendant she was the latter's paramour. *Brown* v. *State,* 119 *Ga.* 572 (3), 575 (46 S. E. 833); *Lundy* v. *State,* 144 *Ga.* 833 (88 S. E. 209). The jury may consider, in determining his credibility, the fact that a witness is the agent for the police in detecting crime. *Clark* v. *State,* 5 *Ga. App.* 605 (3) (63 S. E. 606). The fact that a witness is an employee of one of the parties is a proper matter to be considered by the jury in passing upon his credibility. *Central of Ga. Ry. Co.* v. *Bagley,* 121 *Ga.* 781 (49 S. E. 780). As a general rule a party may show any fact or circumstance that may affect the credit of an opposing witness. *Bates* v. *State,* 4 *Ga. App.* 486 (2), 491 (61 S. E. 888). Thus it may be shown that a witness is under obligation to the party calling him. 8 Enc. Pl. & Pr. 120. So we think the court erred in refusing to permit the sheriff to answer the above question when propounded to him by counsel for the defendant.

5. In the fifteenth ground error is assigned on the refusal of the court to rule out, on motion of the defendant, certain testimony of Sam Byrom, a witness for the State, to the effect that on the night of May 17 he saw a certain automatic pistol presented to him, and that Jim Bennefield brought it to his home. The defendant moved to rule out this testimony, on the ground that acts of Jim Bennefield, after the criminal enterprise, if any, was over, were inadmissible to bind the defendant. We do not think that acts of Jim Bennefield (even if he were a coconspirator of the defendant), done after the conspiracy, if any, had ended, were competent evidence for the State against the defendant on the trial of

the latter; and that the court erred in not ruling out this testimony.

6. In the sixteenth ground it is asserted that the court erred in admitting in evidence certain pistols, guns, rifles, and ammunition, which had been identified by the sheriff. The objections to the admission of these weapons are that they were immaterial, that no one had sworn that they were at the scene of the killing, and that no prima facie case of conspiracy had been made out connecting the defendant with the alleged crime. These objections were specifically urged as to the gun of Lawyer West, the gun found between the mattresses of Fate Chapman, and to the pistol of Jim Bennefield. We think these objections were not well taken as to any one of these weapons, except the pistol of Jim Bennefield, which we do not think had been shown to be his pistol except by his own act after the termination of the alleged unlawful enterprise.

7. In the seventeenth ground it is asserted that the court erred in charging the jury as follows: " The words ' reasonable doubt,' gentlemen, in their intendment and import, mean what they necessarily imply. They do not mean an entire absence of doubt, no doubt at all, an entire want of doubt, nor do they mean a whimsical, capricious, or fictitious doubt, but, as the words imply, a reasonable doubt." The error alleged is that the charge does not explain what a reasonable doubt is, but only explains what a reasonable doubt is not. We do not find any error in this charge.

8. In the eighteenth ground the defendant complains that the court erred in charging the jury as follows: " It is only when a felony is intended that a killing is justifiable. A felony is an offense punishable by death or imprisonment in the penitentiary. If the assailant intends to commit a trespass only, to kill him is manslaughter. If he intends a felony, the killing is self-defense and is justifiable." From the facts set out in this ground we can not say that the court erred in this instruction. It is not alleged why this charge was erroneous. Applicable to the law of self-defense, it was a correct statement of the law; but it would be improper for the court to give this instruction immediately after the court had read to the jury section 70 of the Penal Code, which gives the right to kill " any persons who manifestly intend and endeavor, in a riotous and tumultuous manner, to enter the habi-

tation of another for the purpose of assaulting or offering personal violence to any person dwelling or being therein," without making it plain to the jury that such instruction did not apply to this latter defense. *Hudgins* v. *State,* 2 *Ga.* 173, 182; *Smith* v. *State,* 106 *Ga.* 681 (32 S. E. 851, 71 Am. St. R. 286); *McCrary* v. *State,* 134 *Ga.* 416 (11), 428 (68 S. E. 62, 20 Ann. Cas. 101).

9. The court did not err in giving to the jury the instructions upon the subject of conspiracy, which are set out in the nineteenth, twentieth, and twenty-first grounds of the amendment to the motion for new trial, there being evidence from which the jury might infer the existence of a conspiracy.

10. We come to consider the twenty-second ground of the amendment to the motion for new trial in this case. The court was timely requested to charge, in effect, that no officer, including the sheriff, has any legal authority, without a warrant, to arrest a person charged with a crime, unless such offense was committed in his presence, or the offender is endeavoring to escape, or for other cause there is likely to be a failure of justice for want of an officer to issue a warrant. The court declined to give in charge to the jury the instruction embraced in this request. The court charged the jury on this subject as follows: " It is further charged and contended on the part of the State, that the sheriff gathered together what is known as a posse, alleging that those he gathered together with him were acting under his deputization, and became officers together with and associated with the sheriff. In this connection I charge you that an arrest may be made for a crime by an officer, either under warrant, or without a warrant if the offense is committed in his presence, or the offender is endeavoring to escape, or for other cause there is likely to be a failure of justice for want of an officer to issue a warrant." The above extract from the charge of the court embraces all the instructions of the court upon the subject of illegal arrest. The court did not mention the right of the defendants to resist an illegal arrest, and did not define the bounds in which they could act in so doing. In view of this situation the court committed error in refusing to give the principle of law embraced in the written request set out in this ground of the motion for new trial; and for this reason a new trial should be granted.

11. In the twenty-third ground of his motion the defendant

complains of the refusal of the court, when properly requested in writing, to charge the jury that the sheriff and his alleged posse were without legal authority to attempt to enter the home and habitation of Fate Chapman in the manner in which they did. This request was too general and indefinite. *Smith* v. *State,* 125 *Ga.* 300 (54 S. E. 124); *Spence* v. *Morrow,* 128 *Ga.* 722 (58 S. E. 356); *McElwaney* v. *MacDiarmid,* 131 *Ga.* 97 (62 S. E. 20). Besides, an instruction which does not state any legal proposition is properly refused. *Wright* v. *Western etc. R. Co.,* 139 *Ga.* 343 (77 S. E. 161).

12. It is well settled that a person can use necessary force in resisting an illegal arrest. Such force must be proportionate to that used by the arresting officer. No person can justifiably kill another merely because such person is undertaking to illegally arrest the slayer. If, however, a person kill another to avoid an illegal arrest, and not in a spirit of revenge, the homicide is generally manslaughter, and not murder. If in the progress of the arrest the officer, or other person who attempts to make the same, manifestly intends or endeavors, by violence or surprise, to take the life of, or to commit a felony upon, the person sought to be arrested, then such person would be fully justified in taking the life of such officer or person attempting his illegal arrest. If the circumstances surrounding the person at the time his illegal arrest is attempted are such as to excite the fears of a reasonable man that his life is in danger, or that a felony is about to be committed upon his person, and if under the influence of such fears, and not in a spirit of revenge, he slays the person or officer attempting to illegally arrest him, he would likewise be justifiable in slaying such officer or such person. If he were put in fear of a lesser injury than that of a felony, the homicide would be manslaughter. *Thomas* v. *State,* 91 *Ga.* 204 (18 S. E. 305); *Franklin* v. *Amerson,* 118 *Ga.* 860 (45 S. E. 698); *Porter* v. *State,* 124 *Ga.* 297 (52 S. E. 283, 2 L. R. A. (N. S.) 730); *Perdue* v. *State,* 135 *Ga.* 277, 284 (69 S. E. 184).

13. As a new trial is granted in this case, this court will not consider the question of the sufficiency of the evidence to authorize a conviction. Besides, on another trial, the evidence may be different. Chess Lewis was jointly tried with Wall, but brought

his case to this court in a separate writ of error assigning practically the same errors. His case is controlled by this case.

*Judgment reversed. All the Justices concur, except*

GILBERT, J., dissenting. The writer, being of the opinion that none of the assignments of error require the grant of a new trial, dissents from the judgment of this court reversing the trial judge and ordering a new trial. The judgment of this court in granting a new trial is based only upon the rulings in the second, fourth, fifth and ninth headnotes. It is well recognized that mere error does not require the grant of a new trial. If it were otherwise, especially in long, hotly contested cases, consuming much time and labor, reversals would often result where no injury was suffered by the complainant. In many cases this court has held that harmless error will not require the grant of a new trial. In considering the four rulings upon which the reversal in this case is based, the established facts, many of which are undisputed, should be borne in mind.

1. In the division of the opinion corresponding to the second headnote the majority hold that the court erred in admitting evidence of acts and sayings of coconspirators on the same day and a few hours preceding the homicide. These rulings were held to be error on the ground that the acts and sayings preceded the forming of the conspiracy. The homicide occurred about nine o'clock at night. Something like an hour previously to that time there was much shooting within the city limits of Byromville at the scene where later the homicide occurred. The difficulty between the town marshal and Fate Chapman, which furnished the spark from which afterwards developed the conflagration, figuratively speaking, occurred during the morning of the same day. Almost immediately after the difficulty murmurings and meetings began between those who were, at the time of the homicide, included in the crowd comprising the conspirators. At just what moment the conspiracy was actually formed perhaps no human mind, from the evidence, can definitely say. Under our system of jurisprudence, however, the trial jury are expected to form an exception to the general rule applicable to the mental powers of human beings. It was for the jury to determine when the conspiracy began, if it was not shown without controversy so that it became matter of law. Under the facts of the case the jury were

authorized to find that the formation of the conspiracy preceded all of the acts and sayings which were admitted by the trial court. Moreover, these acts and sayings were admissible to be considered by the jury in determining whether a conspiracy did exist, and when it was formed. The existence of a conspiracy, it has been frequently held, may be shown by circumstances, and in fact can be rarely shown by direct evidence. For all of these reasons it is insisted that the admission of such evidence does not require the grant of a new trial. Compare *Slaughter* v. *State,* 113 *Ga.* 284, 288 (38 S. E. 854, 84 Am. St. R. 242) ; *Coleman* v. *State,* 141 *Ga.* 731, 735 (82 S. E. 228).

According to the rulings of a majority of the court, the trial court was authorized to charge the jury on the subject of conspiracy. It follows, therefore, that there was evidence from which the jury could have found that a conspiracy existed at the time of the homicide. It is not disputed that there were many, including the plaintiffs in error in these cases, at the scene of the homicide, armed with pistols, shotguns, army rifles, and the like, that much shooting occurred previously to the homicide, and that one of those jointly indicted had suggested the first firing for the purpose of attracting " the white people " to the scene. One of the accused had a shotgun and buckshot cartridges, and the body of the deceased was riddled with buckshot. The homicide was undenied, as was also the fact that these defendants were on the scene armed and in a crowd, from the direction of which the gun which killed the deceased was fired; that the deceased was one of the posse led by the sheriff, the town marshal, and the justice of the peace of the district, all of whom were peace officers. Under these circumstances should be viewed the assignments of error on which the case is reversed and remanded for a new trial.

2. One of the rulings on which the judgment is reversed is that found in the fourth headnote, where it is held in substance that the court erred in refusing to permit the defendant to show by the sheriff, who was a witness for the State, on his cross-examination, that he refused to permit counsel for defendant to have a conference with his client out of the presence of other inmates of the same cell. It is contended that such refusal on the part of the sheriff was unfair to the defense, and tended to show bias on the part of the witness against the accused, because

he had allowed the State's counsel this privilege. The only possible relevancy of this testimony was to discredit the testimony of the sheriff. In view of the fact that there was no substantial denial of any of the testimony of the sheriff, and of the very slight basis which this testimony would have afforded to affect the credibility of the sheriff as a witness, it is respectfully insisted that this ruling of the trial judge affords no ground for the reversal of the judgment denying a new trial.

3. In the fifth headnote it is ruled that the court erred in admitting, over the defendant's objection, proof that one of said alleged conspirators, after the criminal enterprise was over, brought to the home of the witness a pistol, and in admitting in evidence such weapon. In connection with this ruling it must be borne in mind that there was admitted in evidence the following: " Colt automatic 32-calibre pistol; large army pistol; Colt 45; three double-barrel shotguns; two rifles; one single-barrel shotgun, together with box of assorted ammunition identified by the sheriff." Surely it could not have been prejudicial to the defendant to have admitted evidence that one of the conspirators, after the conspiracy was over, simply brought to the witness a pistol. In connection with this no evidence was admitted of any saying of the coconspirator who brought the pistol to the witness, but simply that he brought the pistol. The writer cannot conceive of any injury to the defendant resulting from the mere admission by the court of the fact stated. In this connection compare the case of *Horton v. State*, 66 *Ga.* 690. In this case, where several conspired to and did rob another of $590, on the trial of Horton evidence was admitted that one Wilson, a coconspirator, was arrested in another county and that he had $620 concealed in his clothing, among which was a fifty-dollar bill identified by the person robbed as his own; that another conspirator was arrested on the same day in still another county, that he had sixty-five dollars in money, a diamond, and a one-thousand-dollar certificate of deposit; and that he attempted to make an escape. All of these facts were admitted after the robbery had been completed and the conspirators had fled.

4. In the ninth headnote the majority hold that it was reversible error for the court to refuse a written request duly submitted to give in charge the following: " The sheriff or no other

officer has any legal authority to arrest a person charged with a crime, unless the offense was committed in his presence or the offender is endeavoring to escape, or for other cause there is likely to be a failure of justice for want of an officer to issue a warrant." In view of the fact that the court did charge in full Penal Code section 917, which is the precise principle of law requested, but stated it affirmatively, instead of as in the written request, even if error at all, it is not of sufficient importance to require the grant of a new trial. This court has repeatedly held that where the substance of written requests is given in charge instead of using the exact language, a reversal is not required.