## PERDUE *v.* THE STATE.

1. Where remarks are made by the trial judge to counsel in a criminal case in the hearing of the jurors, which counsel contend were of such a character as to prejudice the minds of the jurors hearing them against the cause of their client, they should either move for a postponement of the hearing in order that other jurors may be empaneled than those present when the remark is made, or, if the jurors have actually been selected and empaneled to try the particular case, a motion should be made to have a mistrial declared; and upon the judge's refusal to grant a motion of the character indicated, his ruling would be subject to review. Counsel, having failed to make such motion and having proceeded without objection with the trial, can not, after conviction, raise the question as to the prejudicial nature of the remarks complained of, in a motion for a new trial.

2. An erroneous charge to the jury, to the effect that if they should find the defendant guilty of voluntary manslaughter the form of their verdict would be, "We the jury find the defendant not guilty," was such

an apparent slip of the tongue that the jury could not have been misled into believing that if they found the defendant guilty of that offense it would have the effect of discharging him from all punishment; especially as the judge had previously in his charge covered the subject of voluntary manslaughter, and expressly stated to the jury that under certain facts and circumstances hypothetically stated the defendant would be guilty of voluntary manslaughter, and that it would be the duty of the jury to find him guilty of that offense if they found from the evidence such facts and circumstances to exist.

3. Where one inflicts upon another a wound with a weapon likely to produce death, and the person wounded actually dies in consequence of the wound, the quality of the act of the slayer can not be affected by a lack of skill and care upon the part of those who treat or attempt to treat the wounds and administer remedies therefor.

4. The court did not err in refusing to charge the jury, upon request, that "If you believe from the evidence in the case or the statement of defendant that at the time Porch was shot he was attempting to unlawfully arrest the defendant, the defendant had a right to resist the arrest, and if in so doing he shot Porch for the purpose of disabling him, and not to kill him, and he died afterwards as the result of the wound or wounds, then you should find the defendant guilty of involuntary manslaughter in the commission of a lawful act without due caution or circumspection."

5. It is not error for the court to refuse to give a charge as stated in a written request, where the subject of the request is sufficiently covered by the general charge.

6. In the absence of a pertinent timely request, the failure of the court to charge on the subject of impeachment of witnesses affords no ground for granting a new trial by this court.

7. As a general rule hearsay evidence should not be admitted.

8. "In the trial of a murder case, if at the time of making declarations the condition of the wounded party making them, the nature of his wounds, the length of time after making the declarations before he expired, and all the circumstances make a prima facie case that he was in the article of death and conscious of his condition when he made the declarations, such declarations should be admitted in evidence by the court, under proper instructions to the jury."

9. While the circumstances under which the gun with which the deceased was shot was placed in the buggy of the accused on the evening of the homicide were material for the investigation of the jury, the State contending that the accused had gone to his home and there procured the gun and returned to the place of the homicide with it, and the defendant contending that it had been placed in his buggy by one to whom he had delivered it for the purpose of examination and trial with a view of his buying it, the exclusion of the statement of a witness, that he had "told him that evening that he had decided not to buy the gun," was not cause for the grant of a new trial, where the witness was permitted to relate fully the facts and circumstances attending the return of the gun and the placing of it in the buggy of the accused.

10. The exclusion of the answer of a certain witness to the effect that the accused "was quiet" at the time when his conduct was a proper matter

of inquiry, is not cause for granting a new trial, it appearing that the facts and circumstances showing the conduct of the accused at that time were fully brought out in the evidence; although the direct answer quoted above should not have been rejected on the ground that it was a statement of a conclusion and not of a fact.

11. Evidence that the deceased had bought whisky two or three months before the date of the homicide was properly excluded, where such evidence was offered to establish the fact that the deceased was "a drinking man and drank while on duty, and that he was willing to violate the law in order to get whisky."

12. Witnesses in giving their testimony, except in cases where expert or opinion evidence is proper, are restricted to statements of facts, and are not permitted to state conclusions deduced by them from facts observed.

13. The evidence relied on by the defendant in the present case, even if it would authorize the finding that the jurors might have formed a fixed opinion that the accused was guilty of the crime with which he was charged, and for that reason were incompetent jurors, did not require that finding by the judge, who was the trior of the question raised by the attack upon the competency of the jurors, and therefore did not raise a conclusive legal presumption of disqualification; and the trial judge did not abuse his discretion in overruling the objection to the jurors on the ground of their incompetency.

OCTOBER 18, 1910.

Indictment for murder.    Before Judge Reagan.    Pike superior court.    February 10, 1910.

*A. A. Murphey, R. L. Berner, E. F. Dupree, J. R. Cooper,* and *E. M. Owen,* for plaintiff in error.

*John C. Hart, attorney-general,* and *J. W. Wise, solicitor-general,* contra.

BECK, J.    Benjamin Perdue was tried on an indictment charging him with the offense of murder, it being alleged that he had unlawfully and feloniously shot and killed one Benjamin Porch. It appears from the evidence that the deceased was shot on the night of the 19th of September, 1908.    Two wounds were inflicted; in each wound were many small shot fired from a shotgun.    The deceased was shot between 2 and 3 o'clock a. m., and died at 3 p.m. of the same day.    The defendant in his statement admitted firing one of the shots that struck the deceased, but claimed that the other shot was fired by another person.    Porch died from the effects of the wounds, according to the testimony of several witnesses.    The accused insisted that at the time he fired on Porch, the latter, who was the town marshal of the City of Barnesville, was threatening to arrest him and was advancing on him at a time when he was not committing any offense against the State

or the ordinances of the City of Barnesville. He insists that the threatened arrest was illegal, and that the deceased, upon being informed that the accused was about to start home, replied that he was going to lock him up, and when the accused expostulated, protesting that he had done nothing to be locked up for, Porch replied, that he should not go now, that he was going to lock him up again or kill him, and that the deceased then stepped off the sidewalk into the street and advanced towards the accused, who reached into his buggy and got his gun and fired at the deceased, not for the purpose of killing him, but to prevent the deceased from shooting him, just as deceased stepped from the sidewalk and drew his pistol. The accused claimed, in his statement, that he might easily have killed Porch by shooting him in the head or other vital spot, but that he shot solely for the purpose of preventing a felonious attack upon himself; that he fired only one shot, and that just as he fired, one Martin, who testified as a witness for the State on the trial of the case, appeared immediately by his side, and that Martin made the second shot, grabbing the gun just after the accused had fired the first shot, and that when Martin "grabbed the gun," the accused readily turned it loose, supposing that Martin seized the gun for the purpose of preventing the accused from shooting again. There was evidence introduced by the State to show that the accused fired both shots. The deceased, in his capacity as a police officer, had arrested the accused earlier in the night, and, after having confined him in the city prison for a short time, had released him. There was also introduced by the State evidence of previous threats made by the accused to kill the deceased if he should ever undertake to arrest him. The witness Martin testified that Perdue had gone to his home after his arrest and release earlier in the night, had gotten his gun and returned to the City of Barnesville, and had said that he intended to kill the deceased. The accused introduced evidence to show, that the gun had been placed in his buggy, while he was in the city earlier in the evening, by one with whom he had left the gun for the purpose of examination; that a trade was being negotiated between them for the sale of the gun, but that the intended purchaser had decided not to buy the gun and had returned it to him, placing it in Perdue's buggy, under the apron of the buggy. Other evidence was introduced which it is unnecessary here to set forth, corrobo-

rating the theory both of the State and of the defendant.   Certain
statements of the deceased were introduced in evidence, as dying
declarations, over the objection of the defendant that the State
had not laid the proper foundation for the introduction of this
testimony.   After being charged with the consideration of the case
the jury returned a verdict of guilty, with a recommendation.   The
accused made a motion for a new trial, and, upon its being over-
ruled, brought the case here for review.

1.   In his motion for a new trial the plaintiff in error contends
that he was injured by the use, upon the part of the court, of the
following remarks in the presence of the jurors: "I do not care to
hear from you any farther, Mr. Berner [counsel for defendant].
My mind is made up on this matter; and this case has cost the
county too much already, and there is no use to consume any more
time."   The jurors who tried the case were in the court-room and
heard these remarks.   The jurors had all been called, empaneled,
and sworn, and counsel for the prisoner insists that the remarks
quoted were calculated to prejudice and did prejudice the minds
of the jurors "against defendant's case, in that it caused them to
believe that the defendant was unnecessarily prolonging his case
and thereby imposing an unnecessary expense on the county and
the taxpayers of whom they were a part."   The trial judge ap-
pended the following note to this ground of the motion: "This
[the remark complained of] was said after deciding the motion
when Mr. Berner desired to submit some authorities in support of
the validity of the plea [of former jeopardy].   The court had ref-
erence to the plea alone in saying he had made up his mind on
this matter."   If counsel was of the opinion that the remarks
quoted, and which it is insisted were prejudicial to the cause of his
client, were of such a character as to influence the minds of the
jury prejudicially to the cause of the defendant, he should have
moved for a postponement of the case until other jurors could be
empaneled to try the same, or, if the jury which actually tried the
case had been empaneled and sworn in this particular case, a mo-
tion should have been made for a mistrial, and the judge's refusal
to declare a mistrial or to postpone the trial until other jurors
could be empaneled could have been made matter for exception.
But we do not think that, after knowing the remarks had been
heard by the jurors present, counsel could proceed with the trial

without objection, and, after a verdict of guilty, raise the question which they here seek to have adjudicated in their favor, with the result of setting aside the verdict of the jury and giving the defendant another trial in the court below.

2. The court charged the jury as follows: "Murder is punishable with' death, but the jury may, if they see proper, in the event of a conviction, fix the punishment at life imprisonment in the penitentiary. If you find the defendant guilty of murder, the form of your verdict will be, 'we, the jury, find the defendant guilty.' If you recommend life imprisonment in the penitentiary, the form of your verdict will be, 'we, the jury, find the defendant guilty and recommend that he be punished by imprisonment in the penitentiary for life.' If you find him guilty of voluntary manslaughter, the form of your verdict will be, 'we, the jury, find the defendant not guilty.' Retire and make your verdict." Movant claims that this was error, for the following reasons: "Under this direction of the court, there could be but two verdicts returned by the jury: murder with or without recommendation, and not guilty. (*a*) It tended to confuse the jury. (*b*) It was prejudicial to the defendant, inasmuch as it prevented or tended to prevent the jury from returning a verdict of voluntary manslaughter. The jury might have been satisfied from the evidence that the defendant was guilty of voluntary manslaughter, but, well knowing that a verdict finding the defendant not guilty absolutely discharged him from punishment, they might' very well have refused to return such a verdict, although believing him guilty of voluntary manslaughter. The jury, under the evidence, might have concluded that he deserved to be punished by imprisonment and not be absolutely released from all punishment; but under this direction, they were prevented from so doing, and, as a result, found him guilty with recommendation of imprisonment for life." While it is perfectly clear that the court erroneously directed the jury as to the form of their verdict in case they should find the defendant guilty of voluntary manslaughter, we do not think that the error was of so grave a character as to constitute a sufficient cause for setting aside the verdict in this case. We think it is apparent that the mistake was a mere slip of the tongue (or slip of the pen rather, as the entire charge was in writing), and that the jury was not confused by the mistake of the court or misled into be-

lieving that in the event they should find the defendant guilty of voluntary manslaughter the result of such a verdict would have the effect of absolutely discharging the accused of the consequences of his crime. We do not think that on this account the charge "tended to prevent the jury from returning a verdict of voluntary manslaughter;" because, in the course of his instructions, the trial judge fully covered the subject of voluntary manslaughter and charged them that if they should be satisfied beyond a reasonable doubt "that defendant killed Porch without malice either express or implied,. but upon sudden heat of passion aroused by Porch making an assault upon him, or other equivalent circumstances sufficient to arouse this passion, you should find him guilty of voluntary manslaughter." The jury could not but have understood from the entire charge upon the subject of voluntary manslaughter that if they believed from the evidence in the case that the defendant was guilty of the offense of voluntary manslaughter they should so find. We can not ascribe to a jury such a lack of intelligence as would be implied by holding that they believed, on account of the erroneous instruction as to the form of the verdict, in the event they should find the defendant guilty of voluntary manslaughter he would be entirely discharged from all punishment.

3. Defendant's counsel requested in writing the following charge: "If you believe from the evidence and statement of the defendant, either one or both, that the defendant shot the deceased when the deceased (that is Porch) was attempting to illegally arrest him, and when he shot him he did not intend to kill him, so as to prevent him from arresting him illegally, and if you should believe that the wounds inflicted by the defendant were not necessarily fatal, but if the deceased's wounds had been properly treated he would have recovered, the fact that deceased died from the effects of said wound or wounds would not make the defendant guilty of murder." The court refused to give this charge, and error is assigned upon his refusal. The exception is without merit. This charge involves the doctrine that one may intentionally shoot another and inflict upon him a wound from which he dies, and that the quality of the act of the slayer will be affected by the degree of skill and care with which the injury received by the deceased is treated by those who may be called upon or attempt to treat the wound and administer remedies therefor.

This court has refused to give recognition to any such doctrine. *Allen* v. *State,* 133 *Ga.* 260 (65 S. E. 431). So much of the request to charge as does not involve the doctrine to which we have refused to give our assent was covered by the general charge.

4. The court did not err in refusing to charge the jury, upon request, that "If you believe from the evidence in the case or the statement of the defendant that at the time Porch was shot he was attempting to unlawfully arrest the defendant, the defendant had a right to resist the arrest, and if in so doing he shot Porch for the purpose of disabling him, and not to kill him, and he died afterwards as the result of the wound or wounds, then you should find the defendant guilty of involuntary manslaughter in the commission of a lawful act without due caution or circumspection." If Porch was attempting to arrest the accused under circumstances that rendered the arrest illegal, but the attempt to make the unlawful arrest was not accompanied with such a show of violence as to create in the mind of the defendant a reasonable fear that a felony was about to be committed on him, it was not a lawful act for the accused to shoot the officer attempting to make the arrest. The court in his charge fully covered the theory of the defense, that the attempted arrest by Porch was illegal and accompanied by such a show of violence as put the defendant under reasonable fears that a felony was about to be committed upon him. The request was broad enough to cover the case of an attempt to arrest under circumstances that rendered the arrest illegal but where there were no circumstances accompanying the act of making the arrest tending to put the accused under fear that a felonious attack was about to be made upon him. While the accused would have had the right, if the officer was attempting to effect an illegal arrest, to resist that attempt with force sufficient to prevent the consummation of the arrest, he did not have the right, until the officer had made a greater display of force and the accused was threatened with greater violence than that implied in the mere attempt to effect the arrest, to use a deadly weapon against the officer. And when he did use it in a manner likely to produce death, his violation of the law consisted in the use of the weapon in that manner, and not in any lack of caution when so using it. *Thomas* v. *State,* 91 *Ga.* 204 (18 S. E. 305).

5. Error is assigned in the 6th, 7th, and 8th grounds of the mo-

tion, respectively, on the refusal of requests to give the follow-
ing in charge: (a) "That if they, the jury, believe from either
the evidence in the case or the statement of the defendant that
the deceased was making an effort to unlawfully arrest the' de-
fendant, the defendant had a right to resist the arrest; and if
you believe the deceased accompanied his effort to arrest with a
threat that he would lock up the defendant or kill him, and at
the time draws his pistol, the defendant had a right to kill the
deceased, and you should find him not guilty." (b) "If you should
find in this case that Porch was at the time of the shooting mak-
ing an illegal arrest, and that he was attempting to take in custody
Perdue without a warrant, without any crime committed in his
presence, then I charge you that the prisoner at the bar would
have the right to use force against force, to use just so much force
as was necessary to prevent the illegal arrest, and if it was neces-
sary to kill him to prevent it, then you should acquit the de-
fendant." (c) "I charge you in this case that the law of justi-
fiable homicide in self-defense is not alone applicable, but the de-
fendant had the right also to defend himself against an illegal
arrest; and if he used no more force than was necessary, then, I
charge you, you should acquit the defendant." The instructions
so requested were sufficiently covered by the general charge of the
court, and no further statement of the doctrine there involved was
required.

6. In the absence of a pertinent timely written request, the
failure of the court to charge on the subject of impeachment of
witnesses affords no ground for granting a new trial by this court.

7. Another ground of the motion for a new trial complained of
the exclusion of the following testimony of a witness for defend-
ant: "I asked Frank Banks where Mr. Porch was shot, and he
said he would show me." So far as appears from this extract from
the testimony of the witness Van Horn, that part of it which was
excluded was hearsay and was properly repelled.

8. Error is assigned upon the ruling of the court in admitting
the following testimony of a witness offered by the State: "He
[the deceased] said he was walking up Market street and saw some
one on a wagon tongue. The wagon was out in the roadway. He
said he hallooed, who is that? The reply was, I am Ben Perdue,
and God damn I have got you. He said Perdue shot me, and as

I turned to pull off my glove and get my pistol he shot me again, and I lay there and come to, and I halved, and you answered. He said he was on the sidewalk, the tiling sidewalk in front of Baird's warehouse." This was objected to on the ground that no sufficient foundation had been laid for the introduction of such a declaration, and because the deceased did not make any statement as to his condition until ten o'clock a. m., five or six hours after making the statement contained in the above extract from the evidence of the witness referred to. The judge appended this note to this ground of the motion: "The statement was made at Porch's house between 5 and 6 o'clock. Before making it, he said nothing about being about to die, but said several times 'he was badly shot.'" In *Jones* v. *State,* 130 *Ga.* 274 (60 S. E. 840), it was said: "In order to admit declarations of the deceased as dying declarations, it is unnecessary to prove by direct testimony that he was in the article of death and conscious of his condition, but circumstances may be shown from which these facts may be inferred. Whenever such circumstances make a prima facie case, it is the duty of the court to admit the testimony. The nature of the wound, the condition of the deceased, and all the circumstances may be shown to illustrate the question as to whether or not the deceased was in the article of death and conscious of his condition when the statements were made, and if such circumstances were sufficient to make a prima facie showing that the deceased was in such condition and conscious thereof when he made the statements, the question should be submitted to the jury, leaving them to determine whether the evidence was sufficient to establish the dying condition of the deceased and his knowledge of such condition." In the instant case it appears from the testimony for the State, that between 2 and 3 o'clock a. m. the deceased received two gunshot wounds; that these wounds were of such a nature as to cause the death of the defendant in about twelve hours, or a little over. He was immediately prostrated by the effects of the shots, and became unconscious; he revived sufficiently in a short time to state coherently the circumstances attending the shooting. At about 10 o'clock in the morning he stated, in effect, that he did not expect to live, but he stated several times "that he didn't think he would get up." Dr. C. H. Willis, who was sworn for the State, testified: "I was with him

a good part of the time from 4 o'clock to 10 o'clock [in the morning]. He complained all the time and didn't think he would get up. He said he was badly hurt." And upon counsel asking him the following question: "I thought you said he made that statement at 10 o'clock?" he answered: "He made several statements after that. I don't remember what I did tell him when he made that statement." And upon further examination he stated: "At the time he made the statement his mind was very clear. I heard him make the statement more than once. After he made the statement as to his condition, he made a statement as to who killed him and the course [cause] of the killing. He told the same thing over during the day at different times. This was after he made the statement as to his condition." "Q. Now tell the jury what he said about who killed him, and how it happened; tell what was stated by him after ten o'clock. A. He said he was going down the street towards the railroad to the center of the town, that he had his lantern in his hand with his gloves on, that he saw some one sitting on a wagon tongue on the right-hand side of the street. He was on the sidewalk which was on the left-hand side next to the business houses. When he saw this person, he asked, 'Who is that?' He replied, 'It is Ben Perdue, and I got you, too,' and with that he fired one shot, which struck him in the leg. He said as he turned he was shot in the back. I asked him why he didn't fire. He said he could not get his pistol. He said he was not able to get his glove off, and before he got his glove off he fainted; that after he fainted he did not know how long he was unconscious, but he remembered crawling up the sidewalk and calling for help at that time. That is all the statement I can think of now. He said B. F. Perdue, the defendant, shot him twice."

It will be seen that the time at which the defendant made the statement that he would not get up is somewhat uncertain. The court admitted the evidence of Cochran in reference to the deceased's statement concerning the cause of the killing and the circumstances attending, as well as the testimony of Dr. Willis, above set forth. And in his charge to the jury the court instructed them, touching the subject of the statements of the deceased admitted as dying declarations, in the following language: "Certain evidence has been introduced, claimed by the State to be dying declarations of Porch. Whether any statements were

made by Porch or not, and, if made by him, whether they were dying declarations or not, are questions for the jury. Dying declarations, made by any person in the article of death, who is conscious of his condition, as to the cause of his death and the person who killed him, are admissible in evidence in the prosecution for the homicide. The court has admitted this evidence to the jury, leaving them to determine for themselves whether the statements were or were not made by Porch, and also whether, if made by him, he was at the time in the article of death, and whether he was or was not conscious of his condition. If you believe that Porch made the statements and you believe that he was at the time in the article of death, in a dying condition, and also believe that he was conscious of his condition, then you should consider the statements along with all the other evidence in the case. If you do not believe that he was in the article of death, and whether or not he was conscious of his condition, you may take into consideration all the surroundings, all the proven facts and circumstances in the case. The character of the wounds, the condition of the party at the time, and all the circumstances may be taken into consideration by the jury in determining these questions, but after all they are questions for the jury to determine."

In view of the frequent statements made by the deceased, "that he didn't think he would get up," that he was making this complaint, as the witness Willis testified, "all the time," and in view of the grave nature of the wound, which produced an almost immediate physical collapse, we think the court properly held that a prima facie case for the admission of these declarations had been made, and properly submitted to the jury the question as to whether the statements were the dying declarations of the deceased, under the cautions and restrictions embodied in the extract from the charge which we have above set forth.

9. Movant complains of the ruling of the court in rejecting the following testimony of Quillian Taylor: "Q. Relate the circumstances connected with putting it in there [that is, putting the gun in the buggy on Saturday evening]? A. I told him that evening I had decided not to buy the gun." The circumstances under which the gun was placed in the buggy of the defendant were material for the investigation of the jury, as the State con-

tended that the defendant had gone to his home, secured the gun, and returned to Barnesville with it, while the defense contended that the gun had been in the possession of the witness Taylor, who had taken the gun to examine and try it with a view of purchasing it from the accused. But while the court excluded the testimony of the witness as to what he said in reference to his decision not to buy the gun, he allowed him to state: "I had a double-barrel shotgun in my possession belonging to him, at home. I got it from him with a view of buying it. I put the gun in his buggy that Saturday evening. I went up home after the gun and carried it down and put it in his buggy. . . There was nothing in the gun when I put it in his buggy. I put some shells for the gun in the buggy. They were loaded with shot, numbers 6 or 7 or 8 birdshot [shot of the character of those taken from the wounds of the deceased]. . . I put the gun in Perdue's buggy about sundown. I saw Perdue that evening, after I put the gun in the buggy and started home, about five or six o'clock." (On cross-examination.) "I told him before about putting the gun in the buggy. I put the gun in the foot of the buggy, and covered it with a storm apron. It was full length. It was breached then. Q. Didn't you swear on the other trial you had that gun for the purpose of trying it before you purchased it? A. Yes, sir, that is the reason I had it. Q. Do you swear that now? A. Yes, sir." Manifestly the exclusion of the evidence in regard to the statement of the witness could not have been hurtful to the accused, as the witness was permitted to state fully for what purpose he had had the gun in his possession, when he put it in the buggy of the accused, and the circumstances relating to the return of the gun.

10. While it was competent for a witness to state, in answer to the question as to how the accused was conducting himself at a time when the conduct of the accused was a proper matter of inquiry, that "he was quiet," still the exclusion of this answer is not cause for granting a new trial, where witnesses were permitted to state fully the facts showing how the accused was at that time conducting himself.

11. Evidence that the deceased had bought whisky two or three months before the date of the homicide was properly excluded, where such evidence was offered to establish the fact that the

deceased was "a drinking man and drank while on duty, and that he was willing to violate the law in order to get whisky."

12. The court did not err in rejecting the following testimony of the witness Van Horn: "I saw marks on the sand where he [the deceased] had crawled back to the sidewalk." This was a statement of a mere conclusion by the witness, as he did not pretend to have seen the deceased make the marks on the sand in crawling back to the sidewalk. While the witness might have testified as to seeing marks on the sand, and might have described them for the consideration of the jury, he could not state as a fact that the deceased "had crawled back to the sidewalk."

13. The evidence relied on by the defendant in the present case, even if it authorized the finding that the jurors might have formed a fixed opinion that the accused was guilty of the crime with which he was charged and for that reason were incompetent jurors, did not require that finding by the judge, who was the trior of the question raised by the attack upon the competency of the jurors, and therefore did not raise a conclusive legal presumption of disqualification; and the trial judge did not abuse his discretion in overruling the objection to the jurors on the ground of their incompetency.

None of the grounds of the motion show cause for the grant of a new trial. The evidence authorized the verdict of guilty; and in his charge to the jury the court fully and fairly presented to them the issues involved.

*Judgment affirmed. All the Justices concur.*