## GREEN *v.* THE STATE.

1. The superior courts of this State may grant new trials where material evidence may be illegally admitted or illegally withheld from the jury against the demand for the applicant; but such grant of a new trial is not demanded in all cases where competent and relevant testimony is withheld from the jury.

2. Where the rejected evidence relates to the main transaction and tends to sustain the defense set up by the defendant, the rejection of such evidence would require the grant of a new trial; but when it relates to some collateral matter, and the evidence touching the main transaction makes a clear case of guilt, the rejection of such evidence does not in all cases require the grant of a new trial.

3. Where guilt is clearly established, slight error in the exclusion of evidence does not require the grant of a new trial.

4. The court did not err in refusing to continue or postpone the case in

order to permit the defendant to procure the testimony of his family physician, who would testify that he had prescribed the use of whisky for the wife of the defendant, when suffering from a given complaint, the evidence disclosing that the defendant had a bottle of whisky at the time and place of the homicide, which he claimed that he had procured for his wife under this advice of his physician; as the excluded evidence would not probably have changed the result, and the verdict being right with the excluded evidence in or out.

5. A new trial will not be granted for a refusal of the court to continue or postpone a case for the purpose of obtaining the testimony of an absent witness by whom the defendant expected to prove, in a certain matter, testimony in substance the same as the undisputed evidence introduced by the State in reference to such subject.

6. To render dying declarations admissible, they must be made at a time when the declarant is in the article of death; but if the declarant was in fact in the article of death and the circumstances indicate that he must have known it, it is proper to allow declarations made by him to be proved, with instructions that the jury find whether made consciously in articulo mortis.

7. If at the time of making the declarations the condition of the wounded party making them, the nature of his wounds, the length of time after making the declarations before he expired, and all the circumstances make a prima facie case that he was in the article of death and conscious of his condition, such declarations should be admitted in evidence by the court under proper instructions to the jury.

8. The court did not err in admitting the declaration of the deceased that the defendant " sure did not have to shoot me," over objection on the grounds (*a*) that no proper foundation was laid for its introduction, and (*b*) that the statement was a mere conclusion or opinion of the deceased; a prima facie case for its admission having been made, and the same not being a mere conclusion or opinion.

9. The court did not err in its charge on the subject of dying declarations, on the grounds (1) that there was no legal and sufficient evidence to warrant the same, and (2) because the alleged dying declaration on which this charge was based was a mere opinion of the deceased.

10. The verdict is supported by evidence, and is not contrary to law.

No. 3089.   August 18, 1922.

Indictment for murder.   Before Judge Eve.   Tift superior court. January 17, 1922.

J. M. S. Green was indicted for the murder of Daniel Sutton. The evidence for the State was as follows:

Tom Barfield testified as follows: I am a son-in-law of Daniel Sutton. Was with him on Sunday, July 3, 1921. Went with the deceased late in the morning of that day to J. J. Cravey's home. Can not say how long the deceased and I had been at Mr. Cravey's before Green came, but had been there an hour. Green came to Cravey's in a buggy, driving a mule. Sutton and I remained at

Cravey's, after Green came, some thirty minutes. Left Mr. Cravey's in the buggy with the deceased. There is a gate between Mr. Cravey's and the public road. Green was ahead in his buggy. We all left Cravey's together. When we went through the gate I got in the buggy with Green, after opening and closing the gate. Green drove away first, and Sutton was behind in his buggy. Detected an odor of whisky after getting in the buggy with him. He did not appear to be intoxicated. They stopped, to get water, at my brother's house, which is on the right-hand of the road, going in a northerly direction. The house is close to the road. Both Green and Sutton stopped their buggies right under the China trees before they got to the front gate. Green's buggy was about ten feet from the front gate. Sutton stopped his buggy right behind Green's. Green drove up to the house, turning in to the right, and then cut around to the left toward the road. Sutton drove up behind him and cut his mule around in the same direction. That put the two buggies fairly close together. Just before I got to the well I heard Green tell Sutton he had been throwing off on him. Looked around when I heard them saying that, and saw the old man put his hands in Green's breast lightly, and said " I have not done it." Green said, " You are a liar," and hit him. Sutton was not striking at Green, but just put his hand on his breast in a friendly way. It looked like Green struck Sutton in the breast, and when he struck him, then Sutton struck Green. They just run up together and clinched, and fell in the yard. The old man threw Green on his back and got on top of him and held his arm while he was on the ground. Did not hear Sutton use any profanity whatever to Green, prior to that time, and while they were on the ground. While they were on the ground Sutton did not strike Green. He never offered to strike him at all. That was all that occurred while they were on the ground. Sutton held Green there until I went there and tried to get them up, and not to have any trouble. Kept on talking with them. After a while Sutton asked Green if he had not got enough of it. Green said, " No." Sutton did not say a word at that time, just held him right on, and I kept talking to them. Told Green to get up and not to have nothing like that here. I told him, " If you will be all right, Mr. Sutton will." Sutton then asked Green again if he had enough, and he then said he did. Sutton

just turned him loose and got up. After they got up all of us went out back in the road. Before we went out in the road I brushed the dirt off Mr. Green's clothes. At the time Green got up Sutton did not strike him at all. Didn't make an effort to hit him. Don't know how many times Sutton struck Green. Couldn't say that either one of them hit over a lick apiece; then they went together and down on the ground. As we went out of the gate the buggies were to the south, and we went to the buggy. I stopped at Green's buggy, and old man Sutton walked to the back of the buggy and stopped. Went back of Green's buggy, and that placed him between Green's buggy and his buggy or the front of his buggy, or something like that. He was standing at the front wheels of his buggy and to the rear wheel of Green's buggy. The rear wheel of Green's buggy and the front wheels of Sutton's buggy were about two or three feet apart. They stood there some little bit, and Sutton said, " You ought not to want to fight me, I have not got any gun and you have." Nothing was said before that. After they came out to the buggy and after Sutton said that, Green took his gun out of his front pocket, threw it on the ground between the two men, and said, " Take this here and use it." It was a thirty-eight special pistol, and shoots long-range cartridges, they say. When Green threw his pistol down on the ground, Sutton said, " I don't want your gun, don't need your gun; I don't want to hurt you," and told Green to pick up his gun. Green picked it up and laid it in the front of his buggy, which was immediately in front of Sutton's buggy. When Green picked up the pistol he did not say anything right then, and the next thing he said was, " Let's take a little drink." Sutton said, " I don't want any whisky," and then is when Green shot him.

Sutton had not been drinking any that morning, that I know of. Had been in the buggy with him and close to him that morning. Just immediately before the pistol fired I had turned around and was looking at Sutton. He did not have a thing in his hand. He had not used any profanity at all towards Green at any time during this discussion. He had not cursed him. I turned around to get in the buggy, and that threw my face in a northerly direction; and then Green shot Sutton. He got his pistol, came around by me, and then shot Sutton. When he stepped

around me he stepped between me and the seat, and that threw him between the hind wheel of his buggy and the body of his buggy, and after getting into that position he reached over and shot Sutton. Could not hardly say how close that put the two men together, but it was not very far — they were right together. The ball struck Mr. Sutton in the stomach. The last time I saw Sutton, which was when he looked around just before he was shot, he had not changed his position from what it was before Green shot him or at the time. When I looked and saw Green had shot him, I saw him fall, and when he fell he was to the south of the rear wheel of Green's buggy. From where Green was standing Sutton could not have advanced on him without advancing around the rear wheel, I don't think. Immediately after Green shot Sutton he ran, got in his buggy. He stopped in the road, and called to me. I went out there, and he asked me what I was going to swear in this case, and I told him I was going to tell the truth about how it happened. This occurred in Tift county on Sunday, the third of July, 1921.

Cross-examination: I drove to Cravey's to arrange with him to carry Mr. Sutton to court, the latter expecting to serve on the grand jury. Didn't see Green take either Cravey or any one else off to talk to anyone while I was there. Have no recollection of Green leaving the front porch at any time while I was there. Don't remember that Cravey left the front porch to go anywhere while I was there. The fight took place in the front yard at first. The deceased did not appear to be mad. It is not true that the deceased when drinking frequently got unreasonable and domineering. I would never give Mr. Sutton any whisky. The deceased drank too much once in a while. I was not drinking any liquor at Cravey's that Sunday morning. We did not take a drink there. It is not true that when Green got to Cravey's house the latter brought out a bottle of liquor and we all took a drink there in the front porch. If Green called Cravey off and they went off around the house together, I have no recollection of it. Didn't see Cravey go off out by the barn and the lot and then come back with two bottles of whisky. He did not give me one of them. The deceased did not have any liquor with him. I did not see any liquor that Green had until I got to my brother's house. He

had it in the foot of his buggy. It was in a long bottle. Did not see it when I got in the buggy with Mr. Green. Sutton was about fifty-nine years old, and about six feet high. Sutton did not hit Green at all until after Green struck him. The defendant got a scratch over his eye. At the time Green fired his pistol he was standing just on the outside of the wheels of his buggy on the east side, and he came in between the wheels, and shot this way (indicating). When the defendant asked me what I was going to swear, and I told him I was going to swear the truth if I knew how, he said, "Well, you know I had to do it; he was coming on me with his knife;" and I said, "Mr. Green, if he had a knife I didn't see it." The clothes of the deceased were fired. There was a place actually on fire on his clothes. You could see the ring of the fire was spreading. The hole was getting larger, and I put out the fire. — Redirect: Didn't see any knife in Sutton's hand before Green shot. He did not have a knife.

W. E. Tyson, for the State, testified: I am a practicing physician. Knew Daniel Sutton in his lifetime. Saw him during the afternoon of July 3d this year, about 3:30 o'clock. I found him lying on the ground very quietly, having profuse cold sweats. He was lying in the road but close to a fence in front of John Barfield's house. He was shot with a pistol or a rifle, one. The ball entered his body a little to the left of the nipple, about an inch and a half, and ranged downward to the right of his body. Noticed his clothing; it had been on fire. A small place had been burned out about two inches in diameter. His flesh near and around this wound was smoked and burned black. I first gave him a puncture of morphine and dressed his wound. We brought him to the hospital here. An operation was performed on him. His intestine did not show powder burns. There was no evidence of powder burns beneath the skin. There was evidence of bruises. He was discolored there, and this was caused by the concussion of the gun against him. I would say that the gun was pretty close to him at the time, at a distance of one or two feet, may be not so far. — Cross-examination: At the time I got to Mr. Sutton he was so depressed from the loss of blood that he was practically irrational, and remained that way from that time on until he died. He was very badly depressed. He spoke very plainly whatever he said; and I think he was rational, but very depressed. It was difficult

to get him to speak. When he would speak he would only answer the question propounded to him, and then stop.

The defendant made a statement in his defense, as follows: In April a negro got after his little girl, and since then, in going out at nights, when he would go off and not expect to return until after nightfall, he would carry his gun along with him in his buggy. He just laid it in back of the seat. On Saturday, July 2d, he went to Sycamore to get some scrapes which he left there to be sharpened. At the time he started he could not go there and come back before dark; and knowing that he would be out until after dark, he carried his pistol. Went to Sycamore, and got the scrapes, and came back home about an hour after dark. Just as he got home a cloud was coming up, and it looked like it was going to pour down rain. He unhitched his mule and put it up. He had about four head of mules to feed. He hurried to get through feeding them before the rain started, and in his hurry to get through forgot to take his pistol out of the buggy. On Sunday morning his wife told him she was not feeling very well. She had her monthly period. She said she was feeling mighty bad, and told him she needed a little whisky. Dr. Bellflower had treated his wife when she had her troubles, and had always told him to keep a little whisky on hand for her; "but I did not have a bit, and told her I would go out and see if I could find some for her. I left home about nine o'clock. Went to Mr. Mangham's to return a plow I borrowed from him. Left the plow there with him. I reached under the seat to get a rope to tie my mule, and that is the first time I remembered about having put my pistol in the buggy the night before. I was at Mangham's about two hours. Went on then to where Mr. Barfield lives." In February when his wife was sick with her trouble, and she had to have some whisky that the doctor said would be good for her, he went to Tom Barfield's that time, and got some whisky from John Barfield. "While I was there on that occasion Mr. Sutton came up there, and Tom Barfield cautioned me not to let him know I had any whisky, and said, 'We don't want the old man to get hold of none, because when he gets it he goes raving crazy.' So, on this third day of July, I was looking for some whisky for my wife, and after I got to John Barfield's, where I had been this other time and got some, I found nobody

at home. I went on down the public road to Mr. Cravey's; thought I might be able to get a little from him. When I got to Cravey's, Mr. Sutton, Mr. Barfield, and Mr. Lot Whiddon were ·sitting out on the porch; and Cravey got up, came out to my buggy, and I got out, tied my mule, and called him about the barn there and told him that my wife was sick and I needed a little whisky for her, and asked him if he could let me have any; and he asked me how much I wanted. Told him about a quart,·and he said, ' I will get it for you, but I will have to get up a bottle and have· my wife wash it out,' and he said, ' I will go and get it as soon as my wife cleans the bottle and have it for you when you get ready to go.' Went out to the porch. Lot Whiddon was sitting to the left· of the steps. Sutton was to the left of the steps, and Lot Whiddon was directly in front of the steps. Barfield was sitting to the right of the steps. After a few minutes Mr. Cravey came out on the porch with a cup and a bottle of whisky in his hand, and come up to me and·said, ' Take a drink; we have already had one ahead of you.' Mr. Cravey had been out on the porch once. He went out at the time I did, and then back into the house, and come back out to the porch with a bottle of whisky and a glass in his hand, and come up to me and said, ' Take a drink; we have already had one ahead of you.' I told him to start at the oldest and come down to the youngest. I did not like to drink first. Then he said again, ' John, we have already had a drink ahead of you, but I reckon we can take another.' So we all took a drink together right there on the front porch. Mr. Cravey left the porch again, went out to the barn, and when he came back I remarked that I had to be going, went out to untie my mule, and Mr. Cravey went back of the house about the barn, and Mr. Sutton and Mr. Barfield got up and went to their mule and buggy. They came right behind me when I went out there. Then Mr. Cravey came out there with two quarts of whisky. He handed me one, and Mr. Barfield the other one. Mr. Cravey came out, got into the buggy with me, and went to where the gate in the public road was. He got out just before he got there. When we got there Barfield got out and opened the gate. He was in the buggy with Sutton, and when he opened the gate I drove on through, and Mr. Sutton. came on behind. When I got through and waited for him to close the gate Mr. Barfield come and got in the buggy with me, and we drove

on down the public road. We got to John Barfield's house down the road, and Tom Barfield remarked when we got about there to let's get some water, and we stopped. Left my mule standing about even with the gate, and I turned it just enough to the left so that the hinds wheels were standing in the center of the road and my mule's head even with the gate. Mr. Sutton stopped his buggy about ten steps behind mine, and we got out and went to the well to get a drink of water. When we came out Mr. Sutton remarked to me, ' You are mad with me. Why are you mad with me ? ' I told him, ' I aint mad with you. I haven't got a thing against you.' Then he said, in answer to that, ' Well, I have.' Before I knew anything he hit me a lick there about my ear, then again in my face, and he came on me right then, and when we got to grappling I got on top of him, and got him about his wrist this way, and held him down, and Mr. Barfield ran up and said, ' Mr. Green, don't hurt him; he is drinking, you know.' I told him I was not trying to hurt him. He said, ' Mr. Sutton would not try to hurt you a bit in the world if you was not drinking.' I said to Mr. Barfield, ' I don't want to hurt him,' and got up off him, and Mr. Barfield commenced knocking the dirt from Mr. Sutton. Both of us did that. When we were standing there I noticed Mr. Sutton ran his hand in his pocket, pulled out his knife and opened it; and I didn't like that much. I did not like his appearance. He looked like he was terribly mad. We went on out and I started to get in my buggy, and when I did that he jerked me in my collar when he pulled two buttons off my shirt. I jumped back from him; when I did that he came right on me. Was advancing on me with a knife in his hand, and I knew he intended to cut me to pieces. When I jumped back I holloaed at him and said, ' Don't come on me, Mr. Sutton; don't come on me with that knife.' When I said that, he got up to my buggy about that time and was right on me, and when he did I pulled my pistol from under the seat of my buggy and shot him. I could not say he hit me with the knife, but if I had been one moment later he would have cut me to pieces.

" There had never been a rough word between Mr. Sutton and me. We had always been friends. I would not have done what I did then except that I knew he intended to kill me, and I had to save my life. I got in my buggy, went on, and Mr. Barfield

ran on down the fence, and when I saw him I called to him and said, 'Mr. Barfield, I am sorry for this. I didn't want to hurt Mr. Sutton,' and he told me, 'Mr. Green, I don't blame you for what you have done.' I went on in my buggy, saw Mr. Ross, told him I had shot Mr. Sutton, and for him to go and see about it, and to call Mr. Shaw, the sheriff, and tell him to come and get me, that I would be at my house. I have been here in Tift county for ten years; have always tried to live right, and be a good citizen, and raise my children. Have never had the habit of drinking whisky, but sometimes would take a little drink, and never too much. People who know me know this."

Lot Whiddon testified for the State, in rebuttal: At about noon on Sunday, July 3, of this year, I was at J. J. Cravey's house. Saw Daniel Sutton, Thomas Barfield, and J. M. S. Green at J. J. Cravey's house. When I drove up to Mr. Cravey's house Sutton and Barfield were there, but Green came there afterwards. I was there about thirty minutes, I guess, when he came up. I was sitting in the front porch when Green came up. Green hitched his mule right in front of the house, came from his buggy to the house, came to the porch and sat down, and joined in the conversation going on. During the whole time Green was at Cravey's house and while Sutton and Barfield were there, I did not see any whisky. Mr. Cravey did not come out on the porch with a bottle of whisky in his hand and a glass, and we did not take a drink during the time Green, Sutton, and Barfield were there on the porch or at the house. Did not see Daniel Sutton take a drink there. Did not see Green take a drink. Saw Sutton when he left there, and he did not give any indication whatever of being intoxicated then. Did not see the defendant put a quart of whisky in his buggy when he left there, did not see Sutton and Barfield put another bottle in their buggy when they left there. Just as Mr. Green got up to leave he said to Mr. Cravey that he wanted a drink of water, and he and Mr. Cravey walked around to the well and got some water, but he was back there in just a minute or so, and went right on to his buggy. He did not have any knife in his hand. Cravey did not have anything in his hand. Was present on the porch during the entire time that Green was there, and there was no discussion whatever about whisky. I think my wife is just a little bit related to the deceased. J. J. Cravey is my nephew.

J. J. Cravey, for the State in rebuttal, testified: Know the defendant. Knew Daniel Sutton in his lifetime. On Sunday, July 3d, was sitting on my front porch when Green drove up. Sutton, Barfield, Lot Whiddon, and myself were sitting there on the porch. Did not have any whisky there that day. Did not bring a bottle of whisky and a glass and give them all a drink when they were all there on the porch. Did not furnish a bottle of whisky to Sutton or Barfield and one to Green, when they all got ready to leave. Sutton did not appear to be drinking at any time while he was at my house.

Dr. W. E. Tyson, for the State in rebuttal, testified: Didn't smell any whisky on Sutton at all, but I can not positively say it. Got within five or six inches of his face. That was during the time he was breathing. Did not detect the odor of whisky on him at all. If he had been drinking, I think I would have detected it.

Dempsey Whiddon, for the State in rebuttal, testified: I had known Daniel Sutton ever since I was a little schoolboy. He was a little heavier than I am. I weigh about 155 pounds, and am about five feet and eleven inches high. Saw Daniel Sutton on July 3d this year, if that is the day on which he was shot. Saw him after he was shot. He was lying over under a China-tree at the place where he was shot, at Mr. John Barfield's house. Did not see any knife around Mr. Sutton when I got to him. His head was lying on the ground, and during the time I was there I held his head up in my hand. My head got within a few inches of Mr. Sutton's face. Wanted to do something for him. He was lying there in the dirt, and I put my hand under his head and raised it up, and got some water to wash his face. He was lying there just as he had fallen. He seemed to be in misery, turned and got out of his misery, and then turned back. He spoke to me and Mr. Ross. Mr. Ross first said to him, "What caused this?" I asked him what caused this, and he did not speak right then. Mr. Ross said, "Mr. Green said you were coming on him with a knife, and he had to shoot you." Mr. Ross said that sort of in reply to me. Mr. Sutton sort of turned his head up a little to me and said, "He did not have to shoot me." We were talking about moving him to the porch, and he said "No, let me lay here and die." That was just a minute or two after his first statement. He could have moved himself voluntarily. He rolled over and

called to Thomas Barfield to get his pocket-book. Told him Thomas was not there. Then Thomas came right quick, and he told Thomas to get his pocket-book. It was on the side he was lying on. I told him not to bother it right then. Pretty soon his wife came and kneeled down by him, and he told her to get his pocket-book. He said, "Ma, get my pocket-book. I owe Uncle Jesse $100, and I want you to pay that." He then said, "Did you get them papers?" she said "Yes," and he said, "Well, I want to see them." She presented them to him; he looked at them and said, "That is all right." That is the last he said. My daughter married the son of the deceased. Sutton and I had been lifelong friends and neighbors. I said the deceased said, "He had no right to shoot me." That is what I told counsel when he asked me about it. After Mrs. Sutton came up she managed to get in his pocket under him, and out of that pocket she got his handerkerchief, a bunch of keys, his pocket-book, and a little piece of a knife.

Dr. L. A. Baker, for the State in rebuttal, testified: I am a practicing physician in Tifton, and have been for ten years. Knew Daniel Sutton before his death. Saw him on the evening of July 3 of this year, in bed, in the hospital, in Tifton. His condition was very bad, brought about by a gunshot wound. The bullet entered the body a little to the left of the navel about an inch and a half, and ranged backward to the right. This wound was inflicted with a pistol bullet. His shirt immediately around this wound had been on fire. I can not state the size of the hole made by the fire, positively. The shirt had been torn some at the place where it had been burnt. There was a place sufficient and ample to furnish unmistakable evidence that his shirt had been burnt. Just offhand I would say that the place might have been three or four inches around. The skin immediately around this wound was burnt, scorched, and discolored from powder. A gunshot caused that. From my experience in treating gunshot wounds I would say that the pistol was in very close proximity to Mr. Sutton's body, not over three or four feet away. If this pistol was a long-range Smith & Wesson special, shooting long-range cartridges, it might make some difference. A long-range cartridge carries more powder than the regular powder, I understand. Probably being shot with a pistol of that kind, with the cartridge

mentioned, he could have been as far as three feet and set his clothes on fire from that distance. Did not smell any whisky on Sutton before. Was over him and his body during his operation and before it. Prepared him for the operation. If Sutton had been drinking intoxicating liquors and stump whisky I probably would have detected it on his breath. — Cross-examination: My experience in undertaking to see how far an article would have to be from the muzzle of a pistol to be ignited by the explosion, I have had no more than common observation. Never tried it in an experimental way.

Tom Barfield, recalled, testified, for the State: It is not true that when Mr. Green and Mr. Sutton reached my brother John Barfield's house, Mr. Green and I got out and went in, drew a bucket of water, then walked back to the gate, and when we got back to the gate Mr. Daniel Sutton raised a row with Mr. Green and struck him on his eye. Nothing like that happened. Green did not get his pistol from under the seat of his buggy at the time he shot Sutton. At the time Green shot Mr. Sutton the latter was not attempting to cut him with a knife. I did not at any time pick up a knife near Mr. Sutton or take one from his hand or pocket. I did not see Mr. Sutton with any knife whatever. I did not say to Mr. Green when he stopped me, walked up to the fence, after he had shot Mr. Sutton, " I don't blame you, Mr. Green, for what you did." It is not true that in the tussle Green got Mr. Sutton down and held him. — Cross-examination: Was present when the things were taken out of Mr. Sutton's pocket. His wife took them out. She got his pocket-book and a little roll of paper with some ribbon on it out of his pocket. Never saw her get a knife and handkerchief. Don't personally know whether she got them or not. He had a little barlow knife. Did not see the knife on that occasion.

The jury returned a verdict of guilty, with recommendation. The defendant moved for a new trial on the general grounds, and at the hearing amended his motion. The first ground of this amendment complains of the refusal of the court to continue or postpone the case on account of the absence of two witnesses, Dr. J. M. Bellflower and Dr. H. M. Moore, both residing at Sycamore, Ga. It was shown that Dr. Bellflower was a practicing physician residing at Sycamore, Turner county, Georgia, eighteen miles from

Tifton; that he had been subpœnaed as a witness for the defendant in this case, and was absent without consent or permission, directly or indirectly, of the defendant; that Dr. Bellflower had been the defendant's family physician for eight years; that defendant's wife frequently had trouble at her menstrual periods; that he had attended and prescribed for her on these occasions, had prescribed whisky as being a benefit for her when she had such trouble, and advised that the whisky be kept on hand for her. This showing for continuance or postponement complied with all the requirements of the law touching a motion for continuance. The defendant alleged that this testimony would have been material in his cause, and doubtless a great benefit to him for the reason that it appeared on the trial that at the time the defendant drove up to and stopped his buggy at the scene of the shooting he had a bottle of whisky in his buggy, he in his statement on the trial giving the facts to be shown by the testimony of Dr. Bellflower as above set out, and further stating that on that Sunday morning, the day on which this shooting occurred, his wife was suffering from this trouble and had requested that he try to find her some whisky and that he had gone to J. J. Cravey's and there procured the bottle of whisky he had in his buggy and was carrying it back home to his wife at the time this shooting occurred. It was shown that Dr. H. M. Moore was a practicing physician; that he had attended the deceased after he was shot, reaching him about thirty or forty minutes afterwards; that he examined the deceased as he lay on the ground where he fell from the effects of the shot; and that the shot set Mr. Sutton's clothes on fire and burned the hair on his stomach around the entrance of the bullet; and he would give it as his opinion that when the shot was fired it was obliged to have been right at Mr. Sutton, and that the pistol when fired was touching his body or in close proximity to it. It was shown that this witness had suddenly and unexpectedly left his home for New York; that he had left a few hours before the subpœna reached his home; that the defendant and his counsel had exercised all reasonable and proper diligence in the matter of getting out the subpœna and having Dr. Moore served; and that he was expected back home soon, and certainly before the next term of the court. It was shown that the subpœnas for these two witnesses were applied for by counsel for defendant, and issued on July 13, 1921,

and immediately turned over to a court bailiff for service; that
the one for Dr. Bellflower was served on him at his residence in
Sycamore, where he was sick and not able to be up and leave his
home and attend court; and that on the same day the bailiff tried
to serve Dr. H. M. Moore, but found that he had left on that
day for a trip to New York, and was expected to be gone about
ten days, and left the subpœna for him at his residence. The de-
fendant testified to what he expected to prove by each of these wit-
nesses, and further testified that he was standing as close to the
deceased as a person could be when the pistol fired. Counsel for
the defendant testified to the diligence he had used in getting out
the subpœnas for these witnesses, and the efforts that they had
made to have them served. They and the defendant testified that
they did not know that Dr. Moore was expecting to make a trip to
New York.

In the second ground of the amendment to his motion for new
trial (being numbered the fourth ground, but properly the fifth)
the defendant sets up that the court erred in allowing Dempsey
Whiddon to testify to a statement made by the deceased, the same
being offered as a dying declaration, as follows: " He [the de-
ceased] said, the defendant ' sure did not have to shoot me.' "
The objection to the admission of this testimony was that no foun-
dation had been laid for its introduction. The evidence on this
subject is fully set out in the foregoing statement of facts. It
was further objected that this evidence was a mere conclusion or
opinion of the deceased.

In the sixth ground error is assigned on the following charge
of the court: " Without expressing or intimating in any manner
what has been proven or what has or has not been established
by the evidence in this case, — it is solely the province of the
jury to determine what the facts are from a consideration of all
of the evidence in the case, and the statement of the defendant —
I give you in charge as a rule or principle of law for your con-
sideration in this case that dying declarations, made by any per-
son in the article of death, who is conscious of his condition, as to
the cause of his death and the person who killed him, are admissible
in evidence in a prosecution for the homicide. Where a statement
or an alleged statement of a deceased person is submitted as a
dying declaration, such is admitted only on prima facie proof of its

verity, — that is, its truth. It is for the court in the first instance to determine whether or not the evidence shall be admitted for the consideration of the jury, and it is then the duty of the jury to determine from all of the evidence submitted whether or not the alleged statement was in fact made, and, if made, whether or not in legal contemplation it was a dying declaration. Alleged dying declarations must in no event be considered by a jury, unless they believe from the evidence, beyond a reasonable doubt, that the statement was made by a person in the article of death, who is conscious of his condition, and who spoke concerning the cause of his death and the person who killed him. Dying declarations should be received with great caution by the jury, and the bias, the feeling, the physical and mental condition of the person the requirements or come up to the standard fixed by the law, it should not be considered by the jury for any purpose whatever." It is alleged that this charge is error (1) because there is no legal and sufficient evidence to warrant the same; and (2) be-making the declaration, if these things appear from the evidence, as well as the credibility of the alleged declaration, should be weighed by the jury. If the alleged dying declaration does not meet cause the alleged dying declaration upon which this charge is based was a mere opinion or conclusion of the deceased and not a statement of a fact.

In the seventh ground it is urged that the verdict was contrary to the evidence, without evidence to support it, and contrary to law.

The court overruled the motion for new trial, and error was assigned on this judgment.

*W. Y. Allen, Ridgdill & Mitchell,* and *Perry & Tipton,* for plaintiff in error.

*George M. Napier, attorney-general, R. S. Foy, solicitor-general, Seward M. Smith, assistant attorney-general,* and *Smith & Christian,* contra.

HINES, J. (After stating the foregoing facts.)

1. The defendant moved for a continuance or postponement of his case, on the ground of the absence of Dr. J. M. Bellflower, a practicing physician, who had been subpœnaed as a witness in his behalf, and by whom he expected to prove that his wife frequently had trouble at her menstrual period, that Dr. Bell-

flower had attended her and prescribed for her on these occasions whisky as beneficial to her when she had such trouble, and had advised that whisky be kept on hand for her. The showing for a continuance complied with all the requirements of the law on this subject. The court overruled the motion for a continuance, and this ruling is assigned as error. The only eye-witness to this tragedy testified, on his direct examination, that he detected an odor of whisky on the defendant after getting into the buggy with the latter, just a short time before reaching the place of the homicide; but this witness also testified that the defendant did not appear to be intoxicated. But on the cross-examination of this witness it was brought out by counsel for the defendant that the latter had in his buggy at the scene of the homicide a bottle of whisky. In his statement the defendant told the jury that in the previous February his wife was sick with her menstrual trouble, and that the doctor advised that some whisky would be good for her. At that time he got some whisky from Tom Barfield for her. He further stated that on the day of the homicide he was looking for some whisky for his wife, and went to John Barfield's again to get some, but found nobody at home. He thought that he might get some from J. J. Cravey, and went down there for that purpose, and there got the bottle of whisky which he had in the bottom of his buggy at the time and place of the homicide. It is urged by counsel for the defendant that it was competent and important for the defendant to mitigate, if not excuse, the possession of this whisky by him at the time and place of this tragedy; and that the testimony of Dr. Bellflower would corroborate that part of his statement in which he told the jury that whisky had been prescribed by the family physician for his wife at times when she was suffering from menstrual trouble.

If the possession of whisky by the defendant at the time and place of this killing had been brought out by the State, this contention of the defendant would be stronger. The fact that he had whisky on this occasion was voluntarily brought out by his counsel on the cross-examination of the only eye-witness of this homicide, and in the defendant's statement to the jury. It only appeared from the evidence of the State that this witness smelt the odor of whisky on the person of the defendant. The State

did not show, and did not undertake to show, the possession of whisky by the defendant at the time and place of the commission of the crime for which the defendant was being tried. Under the liberal rule in this State, under which evidence of doubtful competency is admitted, the evidence of this doctor would be admissible to corroborate that part of the defendant's statement in which he told the jury that he had been advised by this physician to furnish whisky to his wife on the occasions when she suffered from her menstruation. Does the refusal of the court to continue this case for the purpose of procuring the testimony of this physician require the grant of a new trial? This situation of the case is no better than it would be if the witness had been present, and the court had illegally rejected this testimony.

The superior courts of this State may grant new trials where material evidence may be illegally admitted or illegally withheld from the jury against the demand of the applicant. Penal Code, § 1086. Under this section the grant of a new trial is not necessarily demanded by the rejection of competent evidence. When the rejected evidence relates to the main transaction, and tends to sustain the defense set up by the defendant, the rejection of such evidence would require the grant of a new trial; but when it relates to some collateral matter, and the evidence touching the main transaction makes a clear case of guilt, the rejection of evidence bearing on such collateral matter, although competent and relevant, does not in all cases require the grant of a new trial. So the refusal of the court to continue the case for the purpose of permitting the defendant to obtain the testimony of an absent witness on some collateral matter, which does not bear upon the main transaction, would not require the grant of a new trial, where the guilt of the accused is clearly and satisfactorily established. Where guilt is clearly established slight error in the exclusion of evidence does not require the grant of a new trial. *Stephens* v. *Crawford,* 1 *Ga.* 574 (44 Am. D. 680) ; *Bird* v. *State,* 14 *Ga.* 43 (4) ; *Jordan* v. *Pollock,* 14 *Ga.* 145; *Hagar* v. *State,* 71 *Ga.* 164, 167.

Even in the case of capital punishment a new trial will not be granted, though some relevant and competent evidence was excluded on the trial, if it be perfectly clear, beyond all doubt, that the conviction and punishment would be no less rightful with the

excluded evidence in, than with it out. *Beck* v. *State,* 57 *Ga.* 351 (2) ; *Brannon* v. *State,* 21 *Ga. App.* 328 (94 S. E. 259). In *Beck* v. *State,* supra, this court said: " None of the excluded evidence bore directly on the main transaction; it did not relate to what took place on the occasion of the homicide. The whole strength of the case is, that, under the circumstances then and there existing, there was no good reason for killing the deceased — that the killing might have been let alone by the prisoner, and that he nevertheless committed the homicide. The evidence kept out would not have changed the real case one iota. There is no cause in the record for granting a new trial."

The undisputed evidence in the present case makes out a clear case of murder. In the statement of the defendant alone is the killing justified. Would the verdict have been different if the absent physician had been present and had sworn that he had advised the defendant to furnish his wife with whisky when suffering from her menstruation? We do not think it would. If the evidence for the State is to be believed, and that was a matter for the jury, the State made out a case, and the proof expected from the absent physician would furnish no ground for a different verdict. So while we think the evidence of this witness was competent and admissible, we do not think the refusal of the court to continue the case for the purpose of procuring this testimony furnishes a ground for the grant of a new trial.

2.　The defendant likewise moved to continue or postpone his case for the purpose of obtaining the testimony of Dr. H. M. Moore, by whom the defendant expected to prove that he attended the deceased immediately after he was shot; that the shirt which the defendant wore at the time of the homicide at the point where the fatal bullet entered was burned out for a space of three inches, and the person of the deceased was scorched, this being caused by the shot which killed the deceased; and that in the opinion of this witness the muzzle of the pistol, when fired, was right against or in very close proximity to the body of the deceased. This evidence would have been competent and admissible, and would have tended to corroborate the statement of the defendant, and his narrative of the facts and circumstances attending the homicide. While this witness had not been subpoenaed, we are of the opinion that the defendant and his counsel exercised due

diligence in their efforts to have him subpœnaed · and to secure his presence at the trial. The subpœna for this witness was issued in due time, was turned over to an officer for service, and the officer attempted to serve him in ample time before the trial, but on the morning when the officer endeavored to serve the subpœna the witness had left the State on a journey to New York. Neither the defendant nor his counsel knew of the intention of the witness to leave the State. Under these circumstances we think due diligence was shown in their effort to procure the attendance of this witness. We do not think, however, that the refusal of the court to continue or postpone the case to procure the testimony of this absent witness is such error, under the facts, as will require the grant of new trial. Dr. L. A. Baker, a witness for the State, testified that he saw the deceased on the evening of the day on which he was shot, that his shirt immediately around the wound had been on fire, that the place burned in his shirt might have been three or four inches around, and that the skin around this wound was burned, scorched, and discolored from the powder of the gunshot that inflicted this wound. . This physician also testified that from his experience in treating gunshot wounds the pistol was in very close proximity to the deceased's body, not over three or four feet away. Dr. W. E. Tyson testified that he saw the deceased shortly after he .was shot, that his clothing had been on fire, that a small place had been burned out about two inches in diameter, and that his flesh near and around the wound was smoked and burned black. Thus the undisputed evidence introduced by the State on this subject was in substance the same as that which the defendant wished to prove by this absent witness. The defendant got the benefit of the evidence thus introduced by the State; and as it was undisputed, there was no necessity for the introduction of cumulative evidence on this point. For this reason there was no such error committed, if any, as will require a new trial, in refusing to continue or postpone the hearing in order for the defendant to procure a witness who would testify substantially as the witnesses for the State had done. *Reich* v. *State,* 63 *Ga.* 616 (3) ; *Woods* v. *State,* 137 *Ga.* 85 (3) (72 S. E. 908) ; *Kent* v. *Central of Georgia Ry. Co.,* 144 *Ga.* 7 (85 S. E. 1017.)

3. It is urged that the court erred in permitting a witness for the State to testify to a statement made by the deceased that

the defendant " sure did not have to shoot me." This was offered
by the State as a dying declaration, and the objections urged to
its admission were that no foundation had been laid for its intro-
duction, and that the same was a mere conclusion or opinion of
the deceased. This statement was made on the day on which the
deceased was shot. He was lying on the ground just as he had
fallen. He seemed to be in misery. He was asked by one Ross,
" What caused this? " The witness testifying to this declaration
then asked him, " What caused this? " The deceased did not
reply. Ross said to the witness who asked this question, that
" Mr. Green said he [the deceased] was coming on him [the
defendant] with a knife, and he [the defendant] had to shoot
him [the deceased]." The deceased then turned his head up a
little to this witness, and made the above declaration.    In a
minute or two after the deceased made this statement those
present were talking about moving him to the porch, and he said
to them, " Let me lay here and die." He was apparently helpless.
He asked another person present to get his pocket-book. Soon
his wife came up and he said to her, " Ma, get my pocket-book.
I owe Uncle Jesse a hundred dollars, and I want to pay him that."
He then said to his wife, " Did you get my papers? " and she
said, " Yes." He said, " Well, I want to see them." She presented
them to him, and he said,   " That is all right." Those were the
last words he spoke. He died at four o'clock a. m. the next
morning from the pistol-shot wound inflicted on him by the de-
fendant on the afternoon before.

To render dying declarations admissible, they must be made at
a time when the declarant is in the article of death. Penal Code,
§ 1026. It is not sufficient to show that at the time the declarations
were made the declarant may have believed he was going to die, if
in fact he was not in articulo mortis. If the deceased was in fact
in the article of death, and the circumstances indicated that he
must have known it, it is proper to allow declarations to be
proved, with instruction that the jury find whether made con-
sciously in articulo mortis. *Young* v. *State,* 114 *Ga.* 849 (40 S.
E. 1000). On the trial of a murder case, if at the time of making
declarations the condition of the wounded person making them,
the nature of his wounds, the length of time after making the
declaration before he expired, and all the circumstances make a

prima facie case that he was in the article of death, and conscious of his condition when he made the declarations, such declarations should be admitted in evidence by the court under proper instructions to the jury. *Lyens* v. *State,* 133 *Ga.* 587 (66 S. E. 792); *Cason* v. *State,* 134 *Ga.* 786 (68 S. E. 554); *Perdue* v. *State,* 135 *Ga.* 277 (69 S. E. 184); *Barnett* v. *State,* 136 *Ga.* 65 (70 S. E. 868); *Jefferson* v. *State,* 137 *Ga.* 382 (73 S. E. 499). The facts necessary to be shown before declarations are admissible as dying declarations may be proved by circumstances. *Oliver* v. *State,* 129 *Ga.* 777 (59 S. E. 900). The facts and circumstances were sufficient to make a prima facie case, and the court did not err in admitting this evidence, on the ground that no proper foundation had been laid.

This declaration was not a mere conclusion or opinion. Whether the defendant had to shoot the deceased was a question of fact. The admission of this testimony falls within the principle ruled in *Darby* v. *State,* 79 *Ga.* 63 (3 S. E. 663), wherein the declaration, " He cut me, and I done nothing to cause it," was let in; *White* v. *State,* 100 *Ga.* 659 (28 S. E. 423), wherein the statement " shot me like a dog " was admitted; *McMillan* v. *State,* 128 *Ga.* 25 (57 S. E. 309), where the statement " shot me for nothing without any cause " was admitted, and *Washington* v. *State,* 137 *Ga.* 218 (73 S. E. 512), where the declaration " shot me for nothing " was admitted. The case at bar can not be differentiated from these cases.

4. In the sixth ground, complaint is made of the charge of the court on the subject of dying declarations; and the errors assigned are: (1) that there is no legal and sufficient evidence to warrant the same; and (2) that the alleged dying declaration on which this charge is based was a mere opinion or conclusion of the deceased, and not a statement of a fact. It follows from what is said in dealing with the admissibility of this evidence that there is no merit in the grounds of attack upon this charge. The evidence justified the giving of this charge, and we have undertaken to show that the dying declaration was not a mere conclusion or opinion.

5. The verdict is supported by the evidence, and is not contrary to law.

*Judgment affirmed. All the Justices concur, except Gilbert, J., absent.*